1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   WAYNE MORRIS,

11              Petitioner,                 No. CIV S-01-1567 DAD P

12        vs.

13   R. A. CASTRO, et al.,

14              Respondents.                <u>ORDER</u>

15   _____/

16              Petitioner is a state prisoner proceeding pro se with an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges the judgment of conviction

18   entered against him in the Sacramento County Superior Court on charges of residential robbery,

19   assault with a deadly weapon, reckless driving while eluding a pursuing peace officer, and

20   beating a police dog.  The third amended petition, on which this action is proceeding, presents

21   the following claims:  (1) the trial court error in allowing the prosecution to call Deputy

22   Anderson as a rebuttal witness; (2) petitioner was denied effective assistance of counsel when

23   trial counsel failed to interview Deputy Anderson before trial; (3) the state coerced petitioner into

24   abandoning his right of self-representation by providing him with inadequate legal materials; (4)

25   the prosecutor engaged in misconduct by failing to timely disclose court ordered discovery; (5)

26   the prosecutor engaged in misconduct by employing unfair surprise in calling Deputy Anderson

as a rebuttal witness and using false testimony to secure a conviction; (6) the trial court denied

petitioner the opportunity to offer testimony favorable to his defense; (7) the prosecutor engaged

in misconduct by informing a witness of petitioner's criminal history and aiding in the changing

of other witnesses' testimony; (8) trial court committed error in not allowing questions regarding

"masked suspects" during trial, in violation of petitioner's rights to confront and cross-examine

witnesses; (9) the prosecutor engaged in misconduct when the prosecutor and police suppressed

exculpatory evidence regarding a 911 tape and police dispatch communications; (10) petitioner

was denied effective assistance of counsel when his trial counsel failed to investigate and utilize

experts; and (11) the trial court committed error in failing to suppress the in-court identification

of petitioner by witnesses, which was suggestive and tainted.  Upon careful consideration of the

record and the applicable law, petitioner's application for habeas corpus relief will be denied.

## PROCEDURAL AND FACTUAL BACKGROUND[1]

> Defendant Wayne Evan Morris was convicted by jury of two counts of residential robbery (Pen. Code, § 211; all further undesignated section references are to the Penal Code), one count of assault with a deadly weapon, a knife (§245, subd. (a) (1)), one count of reckless driving while evading an officer (Veh. Code, § 2800.2), and one misdemeanor count of maliciously striking and kicking a police dog (§ 600, subd. (a)).  The jury also found that defendant used a knife in the residential robbery (§ 12022, subd. (b)).[2]

> In a bifurcated proceeding, the trial court thereafter found that defendant had sustained eight prior felony convictions within the meaning of sections 667, subdivisions (a) and (b) - (I), 667.5, subdivision (b), and 1170.12.

> The trial court sentenced defendant to an aggregate term of 81 years to life in state prison, plus 22 years and 4 months consecutive on the priors.

---

[1]  This summary is drawn from the December 8, 1999, opinion on rehearing by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 1-11, filed on January 8, 2004.  (See Answer, Exhibit E.)  The court stayed the sentence imposed on one of the counts against petitioner and affirmed the judgment of conviction in all other respects.

[2]  Codefendant Gerald Benoit was charged with and convicted of several counts growing out of the same events.  He is not a party to this appeal.

* * *

Prosecution case-in-chief

Around 2:40 a.m. on March 13, 1997, Dana Sutton was driving home from work when he noticed a large dark-red car parked in front of the driveway of a utility pumping station on Auberry Drive, an otherwise residential street in his neighborhood.  He considered this suspicious because a stolen car had been abandoned around the corner from his nearby home a week before.

As Sutton approached the car, he saw two men get out and walk away, wearing dark baggy clothing that looked "gang-type."  One appeared around six feet tall, the other shorter.  Although it was too dark for Sutton to see their faces clearly, he thought both looked black or Hispanic.  Because of his suspicion and his sense that they looked out of place in the neighborhood, he decided to keep watching them.  After driving past, he turned around, came back with his lights off, and parked at the corner.

Sutton watched the two men walk down to Timber Cove Way and disappear between two houses.  Sutton wrote down the address of the house they appeared to be heading for, 8278 Timber Cove Way, then drove back to the parked car and wrote down its license number.  No one was in the car.

Seconds later, Sutton heard glass breaking.  Spotting a nearby house with its lights on, he banged on the door and told the occupant to call 911 because someone was breaking in at 8278.  Then he returned to the parked car and sat in his own car awaiting further developments.

Carlito and Dolores Pimentel, their daughter Annabelle, and their three-year-old grandson lived at 8278 Timber Cove Way.  The family was asleep when defendants broke into their house by shattering a sliding glass door.  The house was dark except for a nightlight in one bedroom.

Carlito awoke, confronted the intruders in the hallway, threw a flower pot at them, and yelled for them to go away.  He also shouted at Dolores and Annabelle to call the police.  Annabelle went to her room, locked the door, and called 911.  Dolores left to calm her grandson in his room, but then returned to the hallway.

/////

/////

/////

/////

Carlito tackled defendant.  After a brief struggle, defendant pulled out a knife, cut Carlito, put the knife to his throat as he demanded all the cash in the house, then held him down while codefendant Benoit ransacked the house.[3]

Benoit slapped Dolores and knocked her to the floor, then held his foot on her as he repeatedly demanded money.  She heard Carlito tell her to give them all the money.  She told them to take the money from her bedroom.  After ordering her to stay in that room with her grandson, they took her purse, which contained credit cards and $140 in cash, and $160 from Carlito's wallet.  The intruders then left the house.  Carlito saw them running toward Auberry Drive.

As defendant and Benoit ran to their parked car, Dana Sutton saw them.  They were carrying things Sutton could not identify.  They seemed excited and out of breath.  Sutton heard one of them say "We did it" or We got him."  They jumped in the car and started to drive off.  Sutton followed.

Sacramento County Deputy Sheriff Todd Gooler, working the night shift with his canine partner "Argo," a 90-pound German shepherd, responded to the radio call of a residential robbery in progress at the Pimentel residence.  As Gooler reached Auberry Drive, he saw a maroon vehicle with two men in it stopped on Auberry at the Calvine Road stop sign.  Defendant was driving; codefendant Benoit was in the front passenger seat.  Sutton, close behind in his car, flashed his high beams, leaned out his window, and shouted to Gooler that the perpetrators were in the maroon car.  Seeing no other cars in the area, Gooler made a U-turn, turned on his flashing lights and siren, and began to pursue the maroon car.  Sutton followed until both cars exceeded 75 miles per hour.

Defendant's car turned north onto Calvine and headed for Highway 99, reaching speeds of over 90 miles per hour, with Deputy Gooler close behind.  On the freeway, defendant drove up to 128 miles per hour, swerving around other cars and two 18-wheeler trucks.  Other police cars joined the chase with their lights flashing.  Throughout the chase, Gooler saw only two men in the maroon car.

Defendant drove off the freeway, ran a stop sign and a stop light, tried to make a left turn at 105 miles per hour, and crashed into a brick wall.  He jumped out of the car and ran.  Deputy Gooler followed in his car and struck defendant with his bumper;

---

[3]  Carlito told investigating officers that this robber was wearing gloves and a green jacket.  When defendant was captured, he was wearing a jacket (introduced into evidence as an exhibit) which he described as maroon or burgundy.

defendant rolled off the hood and resumed running.  Gooler and Argo then pursued him on foot.

As defendant ran back toward his car, Deputy Gooler gave Argo the command to bite.  Argo bit him on the back, throwing him to the ground.  Defendant struggled with the dog, kicking and punching him.  Gooler knocked defendant down with his flashlight.  Another officer joined in the attempt to subdue defendant, who was still forcibly resisting the deputies and Argo. Finally, defendant lay down and seemed to give up, and Argo was called off.  But when an officer tried to handcuff defendant, he stood up, apparently ready to resist again.

Gooler ordered Argo to attack.  Argo bit defendant in the buttocks and knocked him down.  Mace was also sprayed without effect. Finally, three deputies succeeded together in subduing and handcuffing defendant.  Defendant was brought back to the crash scene, then taken to the hospital by paramedics.

After defendant was subdued, Deputy Gooler inspected Argo and determined that the dog had sustained an injury in the rib cage area, which remained sensitive to the touch for several days.

Codefendant Benoit, who had also fled on foot after the crash, was subdued, arrested and placed in the back of a patrol car.  Carlito Pimentel was brought to the scene.  After being told the police "might" have the suspects, he viewed Benoit in the patrol car and immediately identified him as the one who ransacked the house and accosted his wife.[4]

Searching defendant's car, the officers found white socks on the floor and a large kitchen knife on the driver's side; they also found a wallet containing the Pimentels' identification cards and approximately $123 in cash.  Carlito Pimental recognized the knife as the one defendant held on him during the robbery.

/////

---

[4]  Carlito told the police the other robber was approximately 5'10" tall and had a "very heavy build," perhaps 200 pounds.  This description fit defendant.  He also told the police, according to the investigating officer's testimony, that that robber was "Mexican," though he denied having done so at trial; Dolores admitted telling the police something similar, and testified at trial that that robber was white with a fair complexion.  (Booking photographs of defendant in the section 969b packet offered to prove his priors show that, although black, he is light-skinned.)

Both victims testified that the first robber had a small mustache and a slight or trimmed beard.  Deputy Gooler testified that when arrested defendant had a light beard, as if he had not shaved for several days.

Codefendant Benoit, like the second robber as described by the Pimentels, and like the getaway car's passenger as described by Gooler, is black.

In a subsequent lineup at the jail, both Carlito and Dolores picked a person other than defendant.  According to the evidence at trial, the person they identified closely resembled defendant, and Carlito hesitated for a long time before picking him instead of defendant.  Furthermore, although defendant was wearing some sort of hat during the robbery, none of the persons in the lineup had on a hat.  At trial, both Carlito and Dolores identified defendant in court as the robber who attacked Carlito.[5]

<u>Defense case</u>

Defendant testified that on the night of the crimes he and his wife were in the process of moving.  Alone in the car, which was full of clothes and kitchen items, after leaving his wife at her parents' home in Elk Grove, he was making one last trip to drop off possessions at their new residence when he stopped for a red light on Calvine Road at Power Inn Road.  A black man in a red and black 49ers jacket approached and asked if defendant would give him and his friends a ride to Oak Park.  The man was in his 20's, 5'6" or a little taller, and short-haired (a description fitting that of the second robber, according to the victims' testimony).  Defendant agreed to give the men a ride in exchange for gas money.  After giving him $10, the man and his two friends got into the car.  The first man got in the front passenger seat; a light-skinned black or Samoan man in his 30's, 5'8" to 6' tall, wearing a green and white Green Bay Packers jacket, sat in the right rear passenger seat; and codefendant Benoit, in a black sweatshirt, sat behind defendant.

As defendant was on the freeway heading to Oak Park, he noticed a sheriff's vehicle behind him with its emergency lights on, but he heard no siren because he was playing his audio system loudly.  He did not think the deputy was after him because he was driving about 70 miles per hour; his car is old and cannot go faster than 85.  When he got off the freeway at Martin Luther King Jr. Drive, he stopped at the stop light and noticed that the deputy was still behind him with emergency lights on.  It finally occurred to him that the deputy night be pursuing him.  He decided to test this theory by pulling away abruptly and accelerating.  Since it looked as though the deputy was trying to pull him over, he started to slow down.  The passenger in the 49ers jacket told him to keep driving if he knew what was good for him, then reached over with his foot and smashed defendant's foot down on the gas pedal.  Believing the passenger had a weapon, defendant kept driving at about 30 miles per hour.  He never ran any red lights or stop signs.

---

[5]  Dana Sutton, also brought to the scene of the arrests, could not identify codefendant Benoit, though he believed Benoit's clothing was similar to what he had seen earlier on the suspects.  At trial, he identified defendant's voice as that of the person he heard talking as the two men ran to their parked car.

Eventually the deputy rammed the back of defendant's car, causing him to lose control and crash. He got out with his hands up, trying to surrender, but was run into by the deputy's car and knocked to the ground. Then a police dog went for his throat. He was fighting for his life against the dog and against several officers who beat him with flashlights, kicked him, and sprayed pepper spray in his eyes. After he gave up and was handcuffed, the officers sicced the dog on him again; when he fell, they beat and kicked him some more.

Defendant testified that he was never in the Pimentels' house, took no part in the robbery, and did not run from the police. The kitchen knife identified by Carlito Pimental was part of the property defendant was moving to his new residence. Defendant acknowledged that Carlito's wallet was found in his car, but explained its presence as part of a police conspiracy to cover up the fact that they had beaten an innocent man. Because he was attacked immediately after getting out of his car, defendant never saw or found out where the other three men in the car went after the crash. All the witnesses whose testimony contradicted his were mistaken (except Deputy Gooler, who was lying).

Defendant admitted he had suffered three felony convictions for burglary in 1984 and 1987, and for receiving stolen property in connection with one of those counts.

Defendant's wife also testified, generally corroborating his story that they were moving and that their car was full of clothing and kitchen utensils on the night of the crimes.

Rebuttal

Deputy Scott Anderson, called as a rebuttal witness by the prosecution, testified that he participated in the high-speed chase of defendant, driving a car behind Deputy Gooler's. During the chase, Anderson drove at speeds up to 120 miles per hour.

Anderson's car was the second on the scene after the crash. He saw the crash and pulled up right behind defendant's car. He watched as defendant ran off and Deputy Gooler followed in his car until defendant disappeared from view. Anderson saw that there was only one other person in defendant's car, who turned out to be codefendant Benoit; no one else left the car. When Benoit took off and ran, Anderson caught him and grabbed him by the 49ers jacket he was wearing. Benoit escaped temporarily, but Anderson hung onto the jacket. Benoit was apprehended by other deputies.

Anderson made no written report or notes, merely reporting orally to Deputy Gooler.

1  Surrebuttal

2  Called by the defense, Deputy Gooler testified that he had not told
   Deputy Anderson he should not write a report (contrary to
3  Anderson's testimony).  Gooler also stated, contrary to Anderson's
   testimony, that Anderson had not told him about Benoit's jacket.

4

5                              ANALYSIS

6  I.  Standards of Review Applicable to Habeas Corpus Claims

7          A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of

8  some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860,

9  861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v.

10  Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the

11  interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

12  Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas

13  corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377

14  (1972).

15          This action is governed by the Antiterrorism and Effective Death Penalty Act of

16  1996 ("AEDPA").  See Lindh v.Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d

17  1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting

18  habeas corpus relief:

19          An application for a writ of habeas corpus on behalf of a
        person in custody pursuant to the judgment of a State court shall
20      not be granted with respect to any claim that was adjudicated on
        the merits in State court proceedings unless the adjudication of the
21      claim -

22          (1) resulted in a decision that was contrary to, or involved
        an unreasonable application of, clearly established Federal law, as
23      determined by the Supreme Court of the United States; or

24          (2) resulted in a decision that was based on an unreasonable
        determination of the facts in light of the evidence presented in the
25      State court proceeding.

26  /////

                                      8

1   28 U.S.C. § 2254(d).  See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.

2   Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

3          The court looks to the last reasoned state court decision as the basis for the state

4   court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state

5   court reaches a decision on the merits but provides no reasoning to support its conclusion, a

6   federal habeas court independently reviews the record to determine whether habeas corpus relief

7   is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003);

8   Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  When it is clear that a state court has not

9   reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the

10  AEDPA's deferential standard does not apply and a federal habeas court must review the claim

11  de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160,

12  1167 (9th Cir. 2002).

13  II.  Petitioner's Claims

14         A.  Trial Court Error

15         Petitioner raises three claims of trial court error.  Specifically, he claims that the

16  trial court erred when it: (1) allowed the prosecution to call Deputy Anderson as a rebuttal

17  witness over a defense objection; (2) denied petitioner the opportunity to offer testimony

18  favorable to his defense and refused to allow the examination of trial witnesses regarding

19  whether the perpetrators wore masks, in violation of petitioner's rights to confront and cross-

20  examine witnesses; and (3) refused to suppress the in-court identification of petitioner by

21  witnesses, which was suggestive and tainted.  The court will analyze these claims in turn below.

22         1.  Deputy Anderson

23         Petitioner claims that the trial court violated his right to a fair trial when it allowed

24  the prosecution to withhold part of its case-in-chief until after the defense had rested and present

25  the testimony of Deputy Anderson in rebuttal.  He argues that the prosecution used Deputy

26  Anderson to bolster its case with respect to the crucial issue of the number of persons in

9

petitioner's vehicle, making Anderson's corroborating testimony an "unfair surprise."  (Third

Amended Pet. (hereinafter Pet.) at consecutive p. 4.)  Petitioner raised this claim on appeal in

state court, arguing that:

> (1) Anderson's testimony was properly part of the prosecution case-in-chief because the prosecutor knew or should have known before trial that Anderson was part of the arresting team and could give evidence outside Deputy Gooler's knowledge.  (2) Defendant's testimony did not constitute new evidence which the prosecutor could not have anticipated or offer new assertions which were not implicit in defendant's denial of guilt.  (3) By withholding Anderson's testimony for rebuttal, the prosecutor got an unfair opportunity to make defendant appear to be a liar.  (4) If defendant had not testified and been subjected to Anderson's rebuttal, he would have had a strong chance of a more favorable outcome because the prosecution's case-in-chief left the jury ample room for reasonable doubt of defendant's guilt.

(Opinion at 12.)

> The California Court of Appeal fairly summarized the facts surrounding this claim

as follows:

> On the afternoon of Wednesday, July 1, 1998, the prosecutor called the last witness of the day.  The trial court asked counsel outside the jury's presence about scheduling for the next day.  The prosecutor said he had two more witnesses to call, CSI Officer Goodnow (who had taken photographs of the car and booked the evidence) and Deputy Anderson, who had not been subpoenaed.  The prosecutor added that Anderson's name had not appeared in the police reports, but that it had subsequently come up in testimony and discussions with the officers.  The prosecutor had not yet been able to contact Anderson or find out what his testimony might be, but promised to inform defense counsel when he learned more.
>
> Defense counsel then argued over which defendant should put on his case first, each preferring that the other do so.  The trial court ruled that defendant would go first because of a potential <u>Aranda</u> problem (<u>People v. Aranda</u> (1963) 63 Cal.2d 518) involving a statement made to police by codefendant Benoit.  The trial court adjourned for the day with the scheduling of Goodnow's and Anderson's testimony (if any) unresolved.
>
> The next morning the prosecutor declared he was prepared to rest, subject to calling Goodnow and Anderson on Monday.  Defendant's counsel stated he was not ready to proceed with his case because defendant was unwilling to decide whether to testify

until all of the People's evidence was in.  The trial court replied that it did not want to send the jury home for the day; therefore, it had to "either deny [] the DA's request for continuance, or order [] the defense to proceed because of the nature of what is left to testify to."

The court asked the prosecutor for an offer of proof as to Deputy Anderson's testimony.  The prosecutor said he had still not been able to talk to Anderson, but that it appeared Anderson was one of the first officers at the crash scene, was involved in the apprehension of codefendant Benoit, and might be able to explain two things: (1) how the 49er jacket and the utility knife found lying on the ground near the car got there, and (2) "that no one else was seen leaving the vehicle when Defendant Benoit jumped over the fence."  The trial court commented that it "sounds like it's speculation that [Anderson] would have anything at all."  The court and the prosecutor then discussed the testimony of Officer Goodnow.

Ultimately, the court granted the prosecutor's request to call Goodnow on Monday in his case-in-chief and rest subject only to calling him; denied the prosecutor's request to call Anderson on Monday in his case-in-chief, but reserved judgment on whether Anderson's testimony would be admissible as rebuttal; and directed defendant to proceed with his case.  After further argument about Goodnow, the prosecutor agreed to rest without calling him.  Defendant thereupon testified, followed by his wife. He then rested.

On Monday morning, outside the jury's presence, both defense counsel objected to the prosecutor's plan to call Anderson as a rebuttal witness, complaining they had not had discovery about his testimony.  The prosecutor stated that Anderson would testify as follows: he was the second officer in the pursuit, he saw the crash; he saw Deputy Gooler chase defendant; he stayed with the car at the crash scene and saw only one person still in the car, sitting in the right front passenger seat; he saw that person get out and try to escape by scaling a fence while waving a utility knife; he failed to stop the suspect from scaling the fence, but got hold of his 49ers' jacket; he continued the chase on the other side of the fence; finally, another deputy tackled the suspect.  The prosecutor argued that this evidence would rebut defendant's testimony in two respects: it would show that Benoit was wearing the 49ers jacket and was sitting in the right front passenger seat.

The prosecutor added that he had been able to talk to Anderson only that morning, that he had told defense counsel the substance of Anderson's proposed testimony as soon as he learned it himself, and that he had had no idea what defendant would testify to before he took the stand.  The court asked: "*He had not given a statement*

*at any time to the police about the four occupants of the car?*  The prosecutor answered *"No."*  (Italics added.)

Defendant's counsel said that this testimony was inappropriate on rebuttal because it pertained to the prosecution's case-in-chief.  The trial court ruled:

"I agree with Mr. Staats [defendant's counsel] and Mr. Kirby [Benoit's counsel] . . . to the extent that had Mr. Blazina [the prosecutor] known about the content of Officer Anderson's testimony, he could have and should have presented it in his case in chief.

"On the other hand, Mr. Blazina had no idea what [defendant's] testimony would contain, and no reason to believe that there was going to be a claim of more than just the two occupants in the car, those two by inference, and direct evidence being the two defendants.

"Once [defendant] testified that there were other occupants in the car, certainly behooved Mr. Blazina to find out what, if anything Officer Anderson could add.  And he's outlined what Officer Anderson had claimed.  It clearly is rebuttal, and it can be considered by the jury, to whatever extent they want to consider it, as against one or both defendants.

"I deny the motion to exclude the evidence.  It's common in the course of a trial as witnesses testify, whether they are testifying for one's own side or someone else, new information is developed that causes people to scurry to find out whether or not someone can support or rebut that, and that's what happened here."

Benoit's counsel argued that the prosecutor could have discovered the "newly developed evidence" long ago because Deputy Anderson's name showed up in another officer's report about the case.  The court replied that if defense counsel knew of that report, they too could have contacted Anderson earlier.  Benoit's counsel disagreed, saying that officers will not generally speak to defense investigators, defense counsel cannot generally get addresses or telephone numbers for officers, and asking the police liaison to have the officer contact them usually does not work either.  The trial court stood by its ruling that the prosecutor could call Anderson in rebuttal.

(Id. at 13-17.)

Citing California law, the state appellate court rejected petitioner's arguments concerning the rebuttal testimony of Officer Anderson.  (Id. at 17-18.)  That court reasoned that petitioner's testimony presented new unanticipated evidence regarding the number of persons in

12

1   petitioner's vehicle which the prosecutor was entitled to rebut with the testimony of Officer

2   Anderson.  (Id. at 13, 20-21.)  The appellate court explained:

> No evidence suggesting the presence of four men in defendant's
> car on the night of the crimes was known before defendant
> testified.  The prosecutor could not have anticipated that defendant
> would tell such a story, and to assert that it was implicit in his
> denial of guilt is ludicrous.  Because defendant's story presented
> genuinely new evidence, the prosecutor was entitled to rebut that
> story through the testimony of Deputy Anderson.

7   (Id. at 20.)

8         Respondents argue that petitioner's claim in this regard fails to present a federal

9   question.  This court agrees.  As explained above, a writ of habeas corpus is not available for

10   alleged error in the interpretation or application of state law.  Middleton, 768 F.2d at 1085.   The

11   state trial and appellate courts rejected petitioner's arguments on state law grounds, finding that

12   the admission of Deputy Anderson's testimony in rebuttal rather than during the case-in-chief did

13   not violate state evidentiary rules.  Absent some federal constitutional violation, a violation of

14   state law does not provide a basis for habeas relief.  Estelle, 502 U.S. at 67-68.

15         A state court's evidentiary ruling, even if erroneous, is grounds for federal habeas

16   relief only if it renders the state proceedings so fundamentally unfair as to violate due process.

17   Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000); Spivey v. Rocha, 194 F.3d 971, 977-78

18   (9th Cir. 1999); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991); Pike v. Dickson,

19   323 F.2d 856, 860 (9th Cir. 1963) ("It is only where criminal trials in state courts are conducted

20   in such a manner as amounts to a disregard of that fundamental fairness essential to the very

21   concept of justice that due process is offended and that federal court interference is warranted.")

22   "A habeas petitioner bears a heavy burden in showing a due process violation based on an

23   evidentiary decision."  Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005).  In addition, a

24   federal court may not grant habeas relief for trial errors without a showing of actual prejudice,

25   defined as a "substantial and injurious effect or influence in determining the jury's verdict."

26   /////

1   Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting Kotteakos v. United States, 328 U.S.

2   750, 776 (1946)).  See also Bains v. Cambra, 204 F.3d 964, 977 (9th Cir. 2000).

3             This court concludes that the trial court did not commit constitutional error in

4   allowing the prosecutor to present the testimony of Deputy Anderson in rebuttal.  As explained

5   by the state appellate court, petitioner's testimony raised for the first time a question regarding

6   the number of passengers in his vehicle at the time of his apprehension.  Although the prosecutor

7   could have called Deputy Anderson in his case-in-chief, he was not required to do so.  However,

8   after petitioner's direct examination the prosecutor was virtually compelled to call Deputy

9   Anderson in order to rebut the new claim presented by petitioner through his testimony.  Further,

10  the defense had already been apprised of the substance of Anderson's testimony and could not

11  have been surprised that he testified there were only two people in petitioner's car during the

12  pursuit.  (Opinion at 14.)   For these reasons, the state court decision denying this claim is not

13  contrary to or an unreasonable application of the federal due process principles set forth above.

14  Accordingly, petitioner is not entitled to relief on this claim.

15             2.  Precluding Questioning About Whether the Suspects Wore Masks

16             Petitioner next claims that the trial court erred when it sustained a hearsay

17  objection to testimony by Officer Gooler that the suspects of the home invasion robbery were

18  "masked," and when it refused to allow the defense to call Officer Jim Cooper, who told the

19  Sacramento Bee that the suspects wore masks.  (Pet. at consecutive p. 9 (claim 6).)[6]  Petitioner

20  also claims that the trial court erred when it sustained hearsay objections to "all questions about

21  the 'masked suspects.'"  (Id. at consecutive p. 12 (claim 8).)  Petitioner argues that testimony

22  indicating the suspects wore masks would have cast doubt on the victims' identification of him

23  /////

24

25             [6]  In support of his claim regarding Sergeant Cooper, petitioner has submitted a
    newspaper article in which a statement is attributed to "spokesman Sgt. Jim Cooper" that "the
26  masked suspects randomly targeted a home."  (Traverse, Exhibit A at last page.)

14

1    as one of the perpetrators of the robbery, because "if the suspects were masked, there could not

2    be any identification whatsoever." (Id. at consecutive p. 9.)

3            Petitioner raised these claims for the first time in a petition for writ of habeas

4    corpus filed in the Sacramento County Superior Court. (Answer, Ex. O.) The Superior Court

5    rejected petitioner's arguments on the ground that they should have been raised on direct appeal.

6    (Answer, Ex. P at 2.) On August 28, 2000, petitioner raised the same claims in a petition for writ

7    of habeas corpus filed in the California Court of Appeal. (Answer, Ex. K.) That petition was

8    denied with a citation to In re Hillery, 202 Cal. App. 2d 293 (1962). (Answer, Ex. L.) On July

9    24, 2002, petitioner raised the same claims in another petition for writ of habeas corpus filed in

10   the California Court of Appeal. (Answer, Ex. Q.) That petition was summarily denied by order

11   dated August 1, 2002. (Answer, Ex. R.) On September 13, 2000, petitioner raised the identical

12   claims in a petition for writ of habeas corpus filed in the California Supreme Court. (Answer,

13   Ex. M.) That petition was denied by order dated May 23, 2001, with citations to In re Dixon, 41

14   Cal. 2d 756 (1953), In re Waltreus, 62 Cal. 2d 218 (1965), In re Lindley, 29 Cal. 2d 709 (1947),

15   and In re Swain, 34 Cal. 2d 304 (1949). (Answer, Ex. N.) On December 30, 2002, petitioner

16   raised the claims in another petition for writ of habeas corpus filed in the California Supreme

17   Court. (Answer, Ex. S.) That petition was denied by order dated July 30, 2003, with citations to

18   In re Clark, 5 Cal. 4th 750 (1993), In re Miller, 17 Cal. 2d 734 (1941), In re Dixon, In re

19   Waltreus, and In re Lindley. (Answer, Ex. T.) Under these circumstances, it is unclear whether

20   the California Supreme Court denied petitioner's claims on the merits or on purely procedural

21   grounds. However, the claims must be rejected even if a de novo standard of review is

22   employed.

23            The background to petitioner's claims regarding potential testimony that the

24   robbers wore masks is as follows. In Officer Gooler's crime report, he stated that the suspects

25   "wore masks and were armed with knives when they forced entry into the victims' residence."

26   (Reporter's Transcript on Appeal (RT) at 595.) In support of a motion to continue the trial date,

petitioner requested several items of discovery from the prosecution, including photographs of a ski mask and a knife reportedly found in petitioner's vehicle after it was stopped by police.  (Id. at 37-38.)  At the hearing on this motion held on March 5, 1998, the prosecutor stated that he had given to petitioner all of the photographs taken in the case, but that none of the photographs depicted a mask.  (Id. at 38.)  The trial court ordered the prosecution to produce to petitioner all of the photographs in this case.  The following colloquy then took place:

> THE COURT:  All right.  Mr. Morris, let me ask you this: If what you're saying is in part of the police report says there was a ski mask in those photographs and there's not now a ski mask in those photographs, then there's nothing we can do.
>
> DEFENDANT MORRIS:  So no way I can get them?
>
> THE COURT:  There appears to be no photograph that contains that ski mask unless it's already in your possession.
>
> DEFENDANT MORRIS:  Okay.

(Id. at 39.)[7]

Subsequently, petitioner brought a motion to suppress all physical evidence found in his vehicle.  (Id. at 122.)  After a hearing, the trial court summarily denied petitioner's motion "to exclude any evidence pertaining to the car and the car's contents."  (Id. at 172.)  The following colloquy then took place:

> THE COURT:  . . .The last item I believe is the black pullover ski mask, unless there are additional items.  Is that the last item?
>
> THE DEFENDANT MORRIS:  No, there's also something on the dispatch tape.

/////

---

[7]  As will be addressed in more detail below, petitioner was represented by a deputy public defender at his preliminary hearing and through his arraignment in Superior Court.  Thereafter, petitioner's Marsden motion was denied and shortly thereafter he exercised his right to represent himself.  Petitioner eventually obtained a four-month continuance of his trial date.  At the time of this hearing petitioner was representing himself.  On April 13, 1988, the trial court granted petitioner's motion for appointment of counsel and a new attorney was appointed to represent him.  New counsel obtained a two-month continuance on petitioner's behalf and represented him at trial.  (See Opinion at 23-26.)

THE COURT: Okay. The ski mask was on the front seat area of the vehicle. What happened to that?

MR. BLAZINA (the prosecutor): The ski mask was – I can't remember specifically where it was. It was somewhere in the front area of the vehicle. The ski mask was collected. It was booked into evidence. It's in evidence right now. It was viewed by one or both of the defense investigators. We had a photograph taken of it. I think they took photographs of it.

THE COURT: Okay.

MR. BLAZINA: I think that the issue that the defendants have is that one of the reports, I believe by the CSI officer, indicates that a photograph was taken of that area of the car that was – that would show I think it was the knife, something else, and the ski mask. And when you look in the photograph, you don't see the ski mask in the photograph.

I don't know if it's because the angle of the photograph you don't see it. I think it's a shot looking down at the front seat, and then the floorboard area. And if it's tucked underneath the seat, I don't know, or if it had been collected. The officer went by, saw everything that was there, took notes, somebody collected the ski mark (sic), and then the officer took the photograph. I don't know. But no evidence has been destroyed regarding that.

THE COURT: All right. Do you have anything to add on that issue, Mr. Morris?

THE DEFENDANT MORRIS: Yes. It says on page fifty-nine of the initial police report, line three through six, that the CSI Officer Goodnow made observations upon arriving at the scene. He stated he observed on the front floorboard area of the vehicle, near the center area, was a large-bladed knife and a black pullover ski mask.

On page fifty-nine of discovery on line nine, CSI Officer Goodnow stated using color point thirty-five millimeter film and ASA 200 camera, I took the following photographs, closeup views of this evidence in this case.

And on page sixty of discovery, line four, I took closeup views of evidence stand number five showing a large steel-bladed wooden-handle knife on the floorboard area of the vehicle, and a black pullover type ski mask on the front seat area near the floorboard.

Also on page sixty-one, line twenty-five and twenty-eight, also states photographs were taken of the ski mask.

Failure to disclose photographs of the ski mask in the defendant's car violate due process of law. All other evidence in this case is

17

photographed then booked into evidence, except the ski mask. It was (sic) already been a problem in this case regarding evidence, and where's the ski mask from? I don't know where it came from.

Like I said, I was took (sic) to the hospital. And all I know that they said, there's evidence all over your car. And this man says he took photographs. He's the CSI officer in charge of this crime scene. He said he took photographs of this in many areas of this police report, and we don't have the photographs. I don't know where the ski mask came from. And that's what I'm saying.

THE COURT: If, in fact, there are no photographs of the ski mask, that doesn't preclude reference to the ski mask and the admission into evidence of the ski mask.

Do you intend to admit it into evidence, Mr. Blazina?

MR. BLAZINA: Yes.

THE COURT: All right.

MR. STAATS (petitioner's counsel): Your Honor, just to preserve the record, we may object on other grounds at the appropriate time to admission of the ski mask during testimony about that.

THE COURT: Okay.

MR. STAATS: In fact, we might raise it now, since you're on the issue, and that is, that there is no evidence of a ski mark (sic) being used in the commission of this crime. And I think that if the prosecution was allowed to question witnesses about finding such an item in the car, it would be unduly prejudicial without any probative value without some sort of minimal showing that this is connected with the crime at all.

THE COURT: Do you have anything in response to that?

MR. BLAZINA: Yes, your Honor. My understanding of the ski mask, if I remember correctly, is that it's actually a knit cap, the type that you could pull over your face, and there were hand-cut eye holes into it. I don't think it was a standard ski mask that has a large opening that's sewn into it when you purchase it. I think it was hand done, which I think indicates a certain premeditation and planning and sophistication on the part of the defendant.

Furthermore, I believe testimony will show that Mr. Morris wore some type of beanie or cap on his head when he went in and did the home invasion robbery. If I remember correctly, the witnesses had difficulty identifying how long his hair was because he had some type of cap on, and that would be consistent with a ski mask or a

knit cap that one would have on that would roll up and would be
worn on the head.

So I think the evidence would support it not only as being involved
with the home invasion robbery, but showing planning on Mr.
Morris's part to commit the home invasion robbery.  Whether or
not he remembered or chose to pull his mask down over his face
during the home invasion robbery will be another issue, but I think
there is sufficient evidence to show its involvement in this crime.

THE COURT:  The motion to exclude the ski mask is denied as far
as Mr. Staats' arguments as well.

(Id. at 172-76.)

During trial, counsel for petitioner's co-defendant asked Detective Gooler whether

he had "any information that the suspects – both suspects wore masks in the home invasion?"

(Id. at 582.)  The trial court sustained a hearsay objection to this question, and after argument by

counsel for petitioner's co-defendant, the trial judge agreed to "put [his] ruling on the record."

(Id. at 583.)  Subsequently, the court heard additional argument on the admissibility of evidence

regarding whether the perpetrators wore masks during the robbery.  (Id. at 594-95.)  The court

read from Officer Gooler's crime report, which stated that both suspects "wore masks and were

armed with knives when they forced entry into the victims' residence."  (Id. at 595.)  The trial

court questioned Officer Gooler, as follows:

THE COURT: While the jury is absent, let me ask the officer: Did
you prepare that report?

THE WITNESS: Yes, sir.

THE COURT: And what was your source of information
concerning [suspect 1] and [suspect 2] wearing masks and being
armed with knives?

THE WITNESS: That information I would have received from
other officers or another officer.  And I don't remember which
officer or officers that I talked with to get that information.

THE COURT: All right.  Now, from our side bar conference, it
appears that it's hearsay if the purpose is to prove either that
suspect number one and two, in fact, wore masks and both

19

apparently, in fact, were armed with knives.  It's hearsay if that's the intent of the questioning.

It's also hearsay if the purpose is to prove that somebody else told this to this officer, in other words, the purpose being to prove that this was stated to the officer, and that's why he put it on his report.

Seems to me that it's hearsay in that respect, too, proving that someone said this to the officer, even regardless of whether it's true or not.

Now, if, among other things, the victims can be impeached with ever telling anyone that the suspects wore masks and both were armed with knives, that certainly is appropriate.  But it would need to require calling the officer or officers who interviewed the victims to see what they said, what they told him about masks and knives, before inquiring of this officer, who apparently got it second, third, or even more than that, relayed information, since this officer didn't talk to the victim.

(Id. at 596-97.)  After further questioning from the trial judge, Officer Gooler stated that he did not see either suspect wearing a mask or carrying a knife.  (Id. at 597.)  The officer also stated that he did not question the victims himself, but that he had received his information from other officers.  (Id. at 597-98.)  The trial court concluded that the information in Officer Gooler's report was hearsay, ruling as follows:

THE COURT: Again, counsel, from the side bar conference, my ruling is that what he has in his report is hearsay.  And the only relevant purpose would be to prove that the suspects wore masks and both were armed with knives, or that someone told this officer that.  Such information and all of that is hearsay.

* * *

– the fact that a mask is found in a vehicle, if that was the case, that can be presented as evidence.  Anything that was found in the car, I assume, can be offered by the DA or either defense counsel to try to prove something directly or inferentially from that.

(Id. at 598-99.)  Neither petitioner's counsel nor counsel for his co-defendant questioned any witnesses further about the presence of a mask nor did the defense seek to introduce a mask into evidence at.  Finally, neither of the victims testified that the robbers wore masks.

/////

1    Petitioner claims that the trial court's evidentiary rulings with respect to the

2   questioning of witnesses regarding whether the perpetrators wore masks violated his right to due

3   process.  To evaluate whether exclusion of evidence reaches constitutional proportions, the court

4   must balance five factors:  "(1) the probative value of the excluded evidence on the central issue;

5   (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the

6   sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the

7   attempted defense."  Tinsley v. Borg, 895 F.2d 520, 530 (9th Cir. 1990).  A criminal defendant

8   must demonstrate that his interest in presenting evidence in his favor outweighs the state's

9   interest in reliable and efficient trials before a court should interfere with routine evidentiary

10  matters.  Perry v. Rushen, 713 F.2d 1447 (9th Cir. 1983); see also Tinsley, 895 F.2d at 530;

11  Miller v. Stagner, 757 F.2d 988, 994 (9th Cir. 1985).  Only "particularly crucial and reliable

12  evidence" will satisfy this test; "[e]vidence of little importance, whether merely cumulative or of

13  little probative value, will almost never outweigh the state interest in efficient judicial process."

14  Perry, 713 F.2d at 1453.

15    Applying these factors to the case at bar, this court finds that the trial court did not

16  commit constitutional error in sustaining the hearsay objection in question.  Evidence contained

17  in Officer Gooler's report that the suspects wore masks and carried a knife was based on multiple

18  hearsay and was therefore presumptively unreliable.  Because Officer Gooler could not

19  remember who told him about the masks, the evidence was not capable of evaluation by the jury.

20  Neither of the victims testified that the suspects wore a mask.  On the contrary, both of the

21  victims testified that their identification of petitioner was based on their viewing of his face

22  during the robbery.  (See RT at 388, 397, 470-72, 484.)  In light of this testimony, unreliable

23  hearsay evidence that someone reported that the suspects wore masks would not appear to be

24  probative on any issue in this case.  In particular, evidence that Officer Gooler heard from some

25  other officers that the suspects wore masks could not have constituted a major part of petitioner's

26  defense that someone else committed the crimes.  In addition, as described above, the trial court

1   ruled that petitioner could pose appropriate questions to witnesses about the mask and could offer

2   the mask itself as evidence.  The defense chose not to do so.

3          The court also notes that petitioner's trial strategy with respect to this evidence

4   appears to have changed during the course of the trial.  At first, as related above, petitioner's

5   counsel objected to any evidence that a mask was found in petitioner's car.  The defense motion

6   to exclude the mask from evidence, however, was denied.  (RT 176.)  Counsel then apparently

7   decided to seek to highlight the fact that the perpetrators may have worn masks during the

8   robbery.  Petitioner does not explain how, given this change of strategy, the trial court's ruling

9   preventing Detective Gooler from being questioned about other officers telling him that the

10  robbers wore masks resulted in prejudice to his defense.

11         In the traverse, petitioner makes the following argument:

12         First, petitioner contends that there was probative value to the
           information that the suspects in the home invasion robbery were
13         masked.  On one hand, neither victim, Carlito or Dolores Pimentel,
           or the witness, Dana Sutton, testified that either suspect was
14         masked.  On the other hand, the information that the suspects were
           masked was improperly excluded by the court as hearsay as Deputy
15         Gooler testified that he received that from another unknown
           officer.  (RT 596-597.)  It is very unlikely that officer Gooler did
16         not know who the officers were when he received that information.
           Therefore, the officers who were on duty should have been
17         subpoenaed to court to allow officer Gooler to identify that officer.
           Sgt. Jim Cooper of the Sacramento Sheriff's department in a
18         statement to the Sacramento Bee Newspaper stated that the
           suspects were masked.  This statement corroborated officer
19         Gooler's information about the suspects were (sic) masked.  This
           would have also established that petitioner was not involved in the
20         home invasion.  Therefore, the trial court 'cut off' questioning
           regarding the mask as petitioner claims.  This was obviously to
21         prevent petitioner from establishing the fact that he was never
           identified as a suspect in the crime.  To further prevent petitioner
22         from establishing that he was never identified as a suspect is the
           fact that the trial court denied the defense the right to call Sgt.
23         Cooper to testify concerning the fact that the suspects were
           masked.  Therefore, petitioner or his co-defendant were not free to
24         ask questions about the mask because officer Gooler was not
           allowed to be cross examined, and Sgt. Jim Cooper was not
25         allowed to be called to testify.

26  (Traverse at 12.)

1    Petitioner contends, in essence, that evidence the perpetrators were wearing masks

2    would have established that he was not one of the perpetrators because the victims testified the

3    perpetrators were not wearing a mask during the robbery.  This convoluted argument does not

4    support petitioner's due process claim.  Petitioner also argues that evidence the suspects were

5    wearing masks would have cast doubt on the victim's identification of petitioner as one of the

6    perpetrator because "if the suspects was wearing masks at the time of the crime, there could (not)

7    be any identification what so ever."  (Pet. at consecutive p. 10.)  Petitioner contends that "no

8    person or persons could have identified the robbers, as they were 'masked' and wore hats during

9    the entire course of the robbery.  It would have impeached the victims tainted and suggestive

10   identifications and would have shown their identifications had no independent source and was

11   manufactured by misconduct by the police and prosecution."  (Traverse, Ex. A at consecutive p.

12   5.)  This court rejects petitioner's argument that testimony indicating that a police officer was

13   told by some other officer that the perpetrators were reportedly wearing masks would have had

14   any significant impeachment value with respect to the victims' in-court identification.  The

15   victims had good recall of the events in question and were able to describe the perpetrators' faces

16   in some detail.  (See RT at 388, 397, 470-71, 484.)  Unreliable and attenuated evidence that the

17   robbers may have worn masks of some kind would not have changed the result in this case.

18   Petitioner has also failed to establish prejudice resulting from the trial court's

19   exclusion of the testimony in question.  The case against petitioner, even without the victims'

20   identification, was overwhelming.  Petitioner was seen getting into the getaway car and lead

21   police on a high speed chase.  He then acted in an extremely incriminating manner after being

22   apprehended.  The victims' wallet and the knife used in the robbery were found in petitioner's

23   car.  Petitioner's co-defendant, the only other passenger seen in his car, was identified by one of

24   the victims at the scene.  Under these circumstances, the trial court's evidentiary ruling with

25   respect to questions about Officer Gooler's police report did not have a substantial and injurious

26   effect on the verdict in this case.  See Brecht, 507 U.S. at 637-38.

1    Petitioner's assertions regarding Officer Cooper and his claim that the trial court

2    erred in sustaining hearsay objections to "all questions about the 'masked suspects'" (Pet. at

3    consecutive p. 12), are vague and conclusory and should be rejected on that basis.  See Jones v.

4    Gomez, 66 F.3d 199, 204 (9th Cir. 1995) (quoting James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994))

5    ("It is well-settled that '[c]onclusory allegations which are not supported by a statement of

6    specific facts do not warrant habeas relief'").  Petitioner has pointed to nothing in the record

7    indicating that the defense expressed an intention to call Sergeant Cooper as a witness but was

8    denied the opportunity to do so.

9    For all of these reasons, petitioner is not entitled to relief on his claims that the

10   trial court's evidentiary rulings denied him the right to present evidence favorable to the defense

11   in violation of his right to due process.

12                       3.  In-Court Identification

13   Petitioner claims that the trial court violated his right to due process when it failed

14   to suppress the victim's in-court identification of petitioner as the perpetrator of the robbery.

15   Petitioner argues that the in-court identification was "suggestive and impermissibly tainted" by a

16   pretrial identification procedure which, in turn, was "tainted by the prosecution and the

17   Sacramento Sheriff's department which helped and aided the victims in the I.D. process."  (Pet.

18   at consecutive p. 16.)  In his traverse, petitioner implies that the police officers included details in

19   their incident reports which were inconsistent with what they were told by the victims at the

20   scene, thereby giving the victims the idea that the perpetrators had facial hair.  (See Traverse, Ex.

21   C at 3.)  Petitioner also contends that the victims were unable to remember sufficient details

22   about the perpetrators to make a reliable identification, but that they identified petitioner simply

23   because they knew he had been arrested for the crime and because he resembled the person they

24   had picked out of the lineup.  (Id. at 1, 7.)  Petitioner argues, "the fact that the police showed the

25   petitioner to victims at preliminary hearing 'helped' them make their in-court I.D. by cementing

26   the man's face in their memory."  (Id. at 7-8.)

Petitioner notes that after the robbery occurred, Mrs. Pimentel stated she did not think she could make an identification because everything happened so fast and Mr. Pimentel stated he could not remember whether the perpetrator had any facial hair.  (Id. at 1.)  However, later in the proceedings, Mrs. Pimentel made a positive identification of petitioner as the perpetrator and Mr. Pimentel stated with certainty that the robber had facial hair.  (Id. at 3.) Petitioner contends that the circumstances surrounding the identification procedures "made it all but inevitable that the petitioner would be picked out as the man" and resulted in a "substantial likelihood of irreparable misidentification."  (Id. at 4.)  He argues, "the pre-trial confrontations clearly were arranged as to make the resulting I.D.s virtually inevitable, the eyewitnesses 'tainted' I.D. testimony must entirely be excluded."  (Id. at 12-13.)  Finally, as in the arguments described above, petitioner contends that if the suspects were wearing masks the victims would not have been able to make an identification in any event because they would have been unable to see the suspects' faces.  (Id. at 7, 12; see also Traverse, Ex. A at consecutive p. 5.)

Petitioner raised this claim for the first time in a petition for writ of habeas corpus filed in the Sacramento County Superior Court.  (Answer, Ex. O.)  The Superior Court rejected petitioner's arguments on the ground that they should have been raised on direct appeal. (Answer, Ex. P at 2.)  On August 28, 2000, petitioner raised the same claim in a petition for writ of habeas corpus filed in the California Court of Appeal.  (Answer, Ex. K.)  That petition was denied with a citation to In re Hillery, 202 Cal. App.2d 293 (1962).  (Answer, Ex. L.)  On July 24, 2002, petitioner raised this claim in another petition for writ of habeas corpus filed in the California Court of Appeal.  (Answer, Ex. Q.)  That petition was summarily denied by order dated August 1, 2002.  (Answer, Ex. R.)  On September 13, 2000, petitioner raised the same claim in a petition for writ of habeas corpus filed in the California Supreme Court.  (Answer, Ex. M.)  That petition was denied by order dated May 23, 2001, with citations to In re Dixon, 41 Cal. 2d 756 (1953), In re Waltreus, 62 Cal. 2d 218 (1965), In re Lindley, 29 Cal. 2d 709 (1947), and In re Swain, 34 Cal. 2d 304 (1949).  (Answer, Ex. N.)  On December 30, 2002, petitioner raised

1    the claim in another petition for writ of habeas corpus filed in the California Supreme Court.

2    (Answer, Ex. S.)  That petition was denied with citations to In re Clark, 5 Cal. 4th 750 (1993), In

3    re Miller, 17 Cal. 2d 734 (1941), In re Dixon, In re Waltreus, and In re Lindley, by order dated

4    July 30, 2003.  (Answer, Ex. T.)  Thus, it is again unclear whether the California Supreme Court

5    denied this claim on the merits or on purely procedural grounds.  Regardless, the claim must be

6    rejected even if a de novo standard of review is applied.

7            a.  Background

8            The state court record reflects that while proceeding in pro se, petitioner filed a

9    motion to preclude the in-court identification testimony of victims Mr. and Mrs. Pimental.  (CT

10   at 337, 398.)  The motion was eventually argued by petitioner's counsel, who had been appointed

11   in the interim between the filing of the motion and the hearing thereon.  (RT at 217-19.)

12   Petitioner's counsel argued that the victims identified petitioner at his preliminary hearing only

13   because he was the person charged with the robbery and not because they actually recognized

14   him as the perpetrator and that they should be prevented from doing so at trial.  (Id. at 228; see

15   also CT at 348.)  Counsel pointed out that the victims had been unable to identify petitioner at

16   the pretrial lineup, identifying someone else as the perpetrator instead.  (Id.)  Counsel also

17   claimed that the victims' identification of petitioner at the preliminary hearing might have been

18   improperly influenced by the pretrial lineup.  (RT at 226.)  Specifically, he argued that because

19   the victims selected someone with facial hair at the lineup as the perpetrator, they may have

20   decided that the perpetrator had facial hair at the time of the crime.  (Id.)  Counsel pointed out

21   that the victims told the police immediately after the incident that they didn't remember whether

22   the perpetrators had facial hair, but at the preliminary hearing they testified the perpetrator had

23   facial hair.  (Id.; see also CT at 347, 349, 351-52, 378.)[8]  Counsel  argued that it was not logical

24   _____

25        [8] Petitioner described his "actual description" as follows: "At the time of the event the
     defendant was 32 years old, 5'11 weight 240 pounds, is a white male and was arrested with a
     maroon or burgundy coat and also was arrested with a full beard and a mustache."  (CT at 396.)

26   In his traverse, however, petitioner states that he is black.  (Traverse, Ex. C at 13.)

for the victims to remember at the preliminary hearing that the robber had facial hair when they were unable to remember that detail immediately after the robbery occurred.  Counsel also noted that Mr. Pimentel stated at the preliminary hearing that he identified petitioner because he knew he was the person who had been arrested in this case.  (RT at 436.)  In essence, petitioner's counsel argued that the victims identified petitioner simply because the circumstances suggested he was the perpetrator, even though they were unable to actually recognize him as one of the men who committed the robbery in their home.

Petitioner's position with respect to his motion was summarized by the trial court at the hearing as follows:

> THE COURT:  And I don't think he was really arguing – I could be wrong – that the lineup was tainted because he wasn't selected in the lineup.  He was arguing that the witnesses picked somebody else out of the lineup, and then came into the prelim and selected him, and he was suggesting and arguing in his motion that they were manipulated – or suggesting because he was the only one there at the prelim, and that's why they would have felt compelled to select him, even though they selected somebody else at the lineup.

(Id. at 217-18.)  Petitioner's counsel summarized his own argument in support of the motion as follows:

> Just to give you an example, Mr. Pimentel said he couldn't tell whether the person had facial hair or how long his hair was because of the hat.  And yet at the preliminary hearing, I believe he testified the person has a beard here and here on either side and then on the chin.

> If the Court will note that the number four that he picked out at the lineup has a beard in all those three places.  So what I'm suggesting to you, this fellow can't make an identification.  He is – he is going by suggestibility.

> He goes to a – he goes to the prelim – I mean, to the lineup and picks out somebody that has a beard, and so that's who he thinks then is the person, and comes to the – comes to the preliminary hearing and describes the person as having a beard, even though he couldn't describe facial hair when he made a report on the night of the event, and identifies Mr. – Mr. Morris in court at the preliminary hearing, and admits that he's doing it because he knows he's the accused.

27

1           So I don't think the People have even – have evidence that reaches
2           a threshold that any identification can now be made in court in
            front of the jury.

3    (Id. at 220-21.)

4           In response, the prosecutor argued that the preliminary hearing transcript made it

5    clear that the victims were identifying petitioner because of their recollection of his appearance

6    on the night of the crime and not because of any overt suggestiveness.  (Id. at 221.)  The

7    prosecutor also contended that the opportunity to conduct an in-court identification procedure

8    should not be denied because of the mere fact that the victims had the opportunity to view

9    petitioner at the preliminary hearing as the person accused of the crime.  (Id.)

10          The trial court denied petitioner's motion to preclude an in-court identification.

11    (Id. at 229.)  The court found, and petitioner's counsel conceded, that the pre-trial lineup was

12    fair.  (Id. at 227.)  The court also concluded that any inconsistencies between the victims'

13    description of the perpetrators to police officers at the scene and their subsequent identifications

14    at the lineup and the preliminary hearing could be fully explored at trial.  (Id. at 228.)  The

15    made the following explanatory statements:

16           My feeling is that I have come to the conclusion in viewing these
17           photographs and what was said at the prelim and what was said in
            the police reports, that it lends itself to a lot of arguments as to why
            they did what they did and thought what they thought in making
18           selections at the lineup, which is obviously coming in.

19           And it's up to us to find out what they are going to say here at the
20           trial.  They may or may not again select Mr. Morris, or they – for
            all we know, they may say, oh, yeah, he's the one that I saw that
            night.  And yeah, he's the one that I saw at the preliminary hearing.
21           And yeah, he's the one I picked out of the lineup.  That remains to
22           be seen.

23           So because of how I have seen now what Mr. Morris's
            characteristics were the night of the incident when he was arrested,
24           how he appeared at booking, and then how he appeared in the
            lineup, and how he appears now, from what I've been described of
25           how he appeared at the preliminary hearing, all of that can be
            inquired with the witnesses if counsel wants to, so that whatever
            level of certainty or uncertainty they have can be determined in
26           front of the jury.

And I'm going to deny the motion and allow them to be asked what their opinion is regarding Mr. Morris as he looks today . . . together with everything else that they can be asked about, what their opinions were at the lineup, and who they think is who in the lineup.

                                    * * *

And there are all of those features that can be presented to impeach Mr. Pimentel, including what he said at the preliminary hearing, which I don't know if that was the only factor he took into consideration, as Mr. Blazina argues.

And it certainly will undermine, if he makes an identification at the trial, certainly will undermine it that he said that at the preliminary hearing.  He acknowledged that, and obviously that he selected someone other than the defendant at the lineup, but, in my opinion, someone that resembles the defendant as he appears today.

If I were asked to take a look at this lineup photograph and render an opinion as to which one of these is the Defendant Morris, I would easily reach a conclusion or likely reach a conclusion it was number four, or at least number four as well as number two.  All right.

That is my ruling.  The motion is denied, and under Evidence Code Section 352, I agree with you, Mr. Staats, it necessarily will involve all of the issues that the jury will be instructed on . . .

(Id. at 228-31.)

During her trial testimony, Mrs. Pimental identified petitioner as one of the robbers and described his physical appearance at the time she observed him on the night of the robbery.  (Id. at 482-85.)  Mr. Pimental also identified petitioner as the perpetrator and described his appearance from his memory of the robbery.  (Id. at 381, 387-88.)  Counsel for petitioner and co-defendant Benoit cross-examined both victims extensively regarding their ability to identify petitioner, the fact that they selected another person at the lineup, and the inconsistencies in their statements describing the perpetrators throughout the entire identification process. (Id. at 409-39; Traverse, Ex. C at 1-9.)  When asked whether he identified petitioner at the preliminary hearing simply because he knew petitioner had been arrested in connection with the robbery, Mr. Pimentel stated "I do remember distinctly his face as I remember in the house during the commission of the crime, and now I recognize his face."  (RT at 434.)

1           b. Legal Standards

2           The Due Process Clause of the United States Constitution prohibits the use of

3    identification procedures which are "unnecessarily suggestive and conducive to irreparable

4    mistaken identification." Stovall v. Denno, 388 U.S. 293, 302 (1967), overruled on other

5    grounds by Griffith v. Kentucky, 479 U.S. 314, 326 (1987).  A suggestive identification violates

6    due process if it was unnecessary or "gratuitous" under the circumstances.  Neil v. Biggers,  409

7    U.S. 188, 198 (1972).  See also United States v. Love, 746 F.2d 477, 478 (9th Cir. 1984)

8    (articulating a two-step process in determining the constitutionality of pretrial identification

9    procedures: first, whether the procedures used were impermissibly suggestive and, if so, whether

10   the identification was nonetheless reliable).  Each case must be considered on its own facts and

11   whether due process has been violated depends on the totality of the circumstances surrounding

12   the confrontation.  Simmons v. United States, 390 U.S. 377, 383 (1968); see also Stovall, 388

13   U.S. at 302.  "At issue is whether the in-court identification is the product of observations at the

14   time of the crime or impressions made during suggestive pretrial procedures. " United States v.

15   Jarrad, 754 F.2d 1451, 1455 (9th Cir. 1985).

16          If the flaws in the pretrial identification procedures are not so suggestive as to

17   violate due process, "the reliability of properly admitted eyewitness identification, like the

18   credibility of the other parts of the prosecution's case is a matter for the jury." Foster v.

19   California, 394 U.S. 440, 443 n.2 (1969).  See also Manson v. Brathwaite 432 U.S. 98, 116

20   (1977) ("[j]uries are not so susceptible that they cannot measure intelligently the weight of

21   identification testimony that has some questionable feature").  On the other hand, if an

22   out-of-court identification is inadmissible due to unconstitutionality, an in-court identification is

23   also inadmissible unless the government establishes that it is reliable by introducing "clear and

24   convincing evidence that the in-court identifications were based upon observations of the suspect

25   other than the lineup identification." United States v. Wade, 388 U.S. 218, 240 (1967).  See also

26   /////

1  United States v. Hamilton, 469 F.2d 880, 883 (9th Cir. 1972) (in-court identification admissible,

2  notwithstanding inherent suggestiveness, where it was obviously reliable).

3       Factors indicating the reliability of an identification include: (1) the opportunity to

4  view the criminal at the time of the crime; (2) the witness's degree of attention (including any

5  police training); (3) the accuracy of the prior description; (4) the witness's level of certainty at the

6  confrontation; and (5) the length of time between the crime and the identification.  Manson, 432

7  U.S. at 114 (citing Biggers, 409 U.S. at 199-200)).  Additional factors to be considered in

8  assessing the reliability of an identification are "the prior opportunity to observe the alleged

9  criminal act, the existence of any discrepancy between any pre-lineup description and the

10  defendant's actual description, any identification prior to lineup of another person, the

11  identification by picture of the defendant prior to the lineup, failure to identify the defendant on a

12  prior occasion, and the lapse of time between the alleged act and the lineup identification."

13  Wade, 388 U.S. at 241.  The "central question," however, remains "whether under the 'totality of

14  the circumstances' the identification is reliable even though the confrontation procedure was

15  suggestive."  Biggers, 409 U.S. at 199.

16       c.  Analysis

17       The trial court found that the pretrial identification procedures that occurred in

18  this case were not unduly suggestive and that the reliability of the Pimentels' identification of

19  petitioner as one of the perpetrators was therefore a matter for the jury to decide.  This conclusion

20  is reasonable under the circumstances of this case.  At the hearing on petitioner's motion to

21  preclude an in-court identification, all parties agreed that the earlier lineup procedure utilized was

22  not unduly suggestive.  Indeed, defense counsel elicited testimony before the jury that at that

23  lineup the victims had identified another person, and not petitioner, as the robber.  (RT at 429-

24  430, 502-03.)  Petitioner's argument that the identification at the preliminary hearing was based

25  on improper suggestions arising from the lineup or from the police reports is speculative and

26  unsupported and is insufficient to establish a due process violation.  An identification occurring

31

at the preliminary hearing is not rendered unduly suggestive simply because the accused

defendant is present at the proceeding.  An in-court identification is permissible, so long as the

witness has an independent recollection that is untainted by any police misconduct.  See United

States v. Lumitap, 111 F.3d 81, 85 n.4 (9th Cir. 1997).  Further, although the victims' various

statements concerning whether the perpetrators had facial hair were arguably inconsistent and

their identifications may have become more certain over the passage of time, these factors do not

render their subsequent in-court identifications unreliable.[9]  In any event, defense counsel were

permitted to fully explore any questionable aspects of the identification to the jury at trial.  (RT at

419-23, 426-439, 456-57.)   Petitioner has failed to demonstrate that the in-court identification

procedure was unduly suggestive or that any error in the procedure was conducive to mistaken

identification.  The record contains insufficient evidence that the victims' identification of

petitioner was based on a prior suggestive identification procedure or that it was the product of

any suggestiveness at trial.

       As discussed above, this court rejects petitioner's claim that testimony indicating

that the robbers reportedly wore masks would have invalidated the victims' identifications of

petitioner as one of the robbers or would have provided evidence of police misconduct.  The

victims testified at length about the facial characteristics of the perpetrators, which they observed

during the robbery.  Although Mr. Pimentel testified that petitioner was wearing a knitted hat

(RT 380-81), neither victim testified that the perpetrators wore masks.  Hearsay evidence that the

robbers were reported to be masked would have had no significant impact on this testimony.

       Finally, even assuming arguendo that the in-court identification that occurred here

was unduly suggestive, any error was harmless under the circumstances of this case.  Whether a

defendant's due process rights were violated by the admission of identification testimony based

---

[9]  In this regard, the court notes that the victims were Filipino and English was not their native language.  They employed an interpreter at trial.  Accordingly, parsing their exact words to the police on the night of the robbery may be somewhat misleading.

upon a suggestive pretrial identification procedure is subject to harmless error analysis.  Jarrad,

754 F.2d at 1458.  Here, the evidence against petitioner was overwhelming.  In this regard, as

noted by the California Superior Court,

> a witness observed Petitioner and a co-defendant enter the victim's
> residence and come out carrying items.  The witness followed
> Petitioner's car until he flagged down law enforcement and a chase
> ensued.  Two deputies testified that there were only two occupants
> of the car, from which petitioner and the co-defendant eventually
> emerged.  In the car was the knife used in the robbery.

(Answer, Ex. P at 2.)  In addition, Mr. Pimentel's wallet was found in petitioner's car.  Under

these circumstances, petitioner cannot demonstrate that any error stemming from the victims' in-

court identification of him had a "substantial and injurious effect on the verdict."  Brecht, 507

U.S. at 637-38.

Petitioner has failed to demonstrate that the state courts' rejection of his claim of

trial court error in denying his motion to suppress "identification evidence" was contrary to or an

unreasonable application of federal law.  Accordingly, petitioner is not entitled to relief on this

claim.

B.  Ineffective Assistance of Trial Counsel

Petitioner claims that he received ineffective assistance of trial counsel because

his attorney failed to interview Deputy Anderson as part of his pretrial investigation and failed to

present expert witness testimony.  After setting forth the applicable legal principles, the court

will evaluate these claims in turn below.

1.  Legal Standards

The Sixth Amendment guarantees the effective assistance of counsel.  The United

States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

counsel, a petitioner must first show that, considering all the circumstances, counsel's

performance fell below an objective standard of reasonableness.  Id. at 687-88.  After a petitioner

1    identifies the acts or omissions that are alleged not to have been the result of reasonable

2    professional judgment, the court must determine whether, in light of all the circumstances, the

3    identified acts or omissions were outside the wide range of professionally, competent assistance.

4    Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  In assessing an ineffective assistance of

5    counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide

6    range of professional assistance.'"  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting

7    Strickland, 466 U.S. at 689).  There is in addition a strong presumption that counsel "exercised

8    acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d

9    695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

10          Second, a petitioner must establish that he was prejudiced by counsel's deficient

11   performance.  Strickland, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable

12   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

13   been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine

14   confidence in the outcome."  Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224

15   F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not determine whether counsel's

16   performance was deficient before examining the prejudice suffered by the defendant as a result of

17   the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of

18   lack of sufficient prejudice . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949,

19   955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

20          Defense counsel has a "duty to make reasonable investigations or to make a

21   reasonable decision that makes particular investigations unnecessary."  Strickland, 466 U.S. at

22   691.  "This includes a duty to . . . investigate and introduce into evidence records that

23   demonstrate factual innocence, or that raise sufficient doubt on that question to undermine

24   confidence in the verdict."  Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) (citing Hart v.

25   Gomez, 174 F.3d 1067, 1070 (9th Cir. 1999)).  In this regard, it has been recognized that "the

26   adversarial process will not function normally unless the defense team has done a proper

investigation." Siripongs v. Calderon (Siripongs II), 133 F.3d 732, 734 (9th Cir. 1998) (citing

Kimmelman, 477 U.S. at 384). Therefore, counsel must, "at a minimum, conduct a reasonable

investigation enabling him to make informed decisions about how best to represent his client."

Hendricks v. Calderon, 70 F.3d 1032, 1035 (9th Cir. 1995) (quoting Sanders v. Ratelle, 21 F.3d

1446, 1456 (9th Cir. 1994) (internal citation and quotations omitted). On the other hand, where

an attorney has consciously decided not to conduct further investigation because of reasonable

tactical evaluations, his or her performance is not constitutionally deficient. See Siripongs II,

133 F.3d at 734; Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998); Hensley v. Crist, 67

F.3d 181, 185 (9th Cir. 1995). "A decision not to investigate thus 'must be directly assessed for

reasonableness in all the circumstances.'" Wiggins, 539 U.S. at 533 (quoting Strickland, 466

U.S. at 691). See also Kimmelman, 477 U.S. at 385 (counsel "neither investigated, nor made a

reasonable decision not to investigate"); Babbitt, 151 F.3d at 1173-74. A reviewing court must

"examine the reasonableness of counsel's conduct 'as of the time of counsel's conduct.'" United

States v. Chambers, 918 F.2d 1455, 1461 (9th Cir. 1990) (quoting Strickland, 466 U.S. at 690).

Furthermore, "'ineffective assistance claims based on a duty to investigate must be considered in

light of the strength of the government's case.'" Bragg, 242 F.3d at 1088 (quoting Eggleston v.

United States, 798 F.2d 374, 376 (9th Cir. 1986)). See also Hayes v. Woodford, 301 F.3d 1054,

1070 (9th Cir. 2002).

### 2. Failure to Interview Deputy Anderson

Petitioner claims he was denied effective assistance due to his trial counsel's

failure to interview Deputy Anderson before calling petitioner to testify. Petitioner states that

Deputy Anderson's name was contained in discovery materials and was therefore known to

counsel. He contends that the trial court "used defense counsel's failure to interview Deputy

Scott Anderson as an excuse to admit Anderson's testimony as rebuttal evidence." (Pet. at

/////

/////

consecutive p. 5.)  Petitioner does not state whether he would have elected not to testify had he

known the substance of Deputy Anderson's testimony. [10]

Petitioner raised this claim for the first time on appeal.  (Answer, Ex. D at 2.)  The

California Court of Appeal rejected petitioner's arguments with the following reasoning:

> Here, the record is insufficient to support defendant's claim of
> deficient performance.  First, Benoit's counsel explained why he
> and defendant's counsel had been unable to interview Anderson,
> and (assuming defendant's counsel may be deemed to have joined
> in this explanation) defendant points to no evidence that the
> explanation was contrary to fact.[11]  Second, so far as defendant
> contends that counsel advised him to testify, ignorant of the
> devastating effect of Anderson's likely testimony, and that
> defendant would not have testified but for counsel's advice, the
> claim fails because counsel was never asked on the record whether
> he advised defendant to testify.[12]  Since the record sheds no light
> on this question, this aspect of defendant's claim cannot be raised
> on direct appeal.  (citations omitted.)

> Moreover, even assuming counsel's performance was deficient in
> not interviewing Anderson and allowing defendant to testify, there
> is no ineffective assistance of counsel on this record.  If neither
> defendant nor Anderson would have testified, the case would have
> gone to the jury on the evidence contained in the prosecution's case
> in chief.  The jury would surely have convicted defendant of all
> charges based on that evidence.  Hence, defendant cannot show
> that a better outcome was reasonably likely in the absence of
> counsel's deficient performance.

(Opinion at 21-22.)

/////

---

[10]  In rejecting petitioner's argument in this regard the California Court of Appeal observed that it amounted to an assertion of the right to commit "risk-free perjury." Opinion at 12-13, n.5.

[11]  Defendant asserts that co-counsel said only that police will not talk to defense investigators, then dismisses this excuse as inadequate because a refusal to talk to defense investigators could be used to impeach the officer for bias on cross-examination.  Actually, co-counsel said more than that: he also said that defense counsel cannot generally get addresses or phone numbers to contact officers directly and that attempting to reach them through police liaisons is futile in his experience.  Nothing controverting these assertions appears in the record.

[12]  Furthermore, since the record does not show that defendant had ever told counsel the story he told on the stand, we cannot say whether counsel could possibly have known that defendant's testimony would open the door to rebuttal evidence.

1    The opinion of the state appellate court that petitioner failed to establish deficient

2  performance or prejudice with respect to this claim is not unreasonable and should not be set

3  aside.  Counsel for petitioner's co-defendant explained on the record why it would have been

4  futile to attempt to interview Deputy Anderson prior to trial.  Petitioner has not challenged that

5  explanation in his petition before this court.  Further, as explained by the state appellate court,

6  the evidence against petitioner was overwhelming, virtually forcing him to take the stand in order

7  to provide an alternative explanation for the damaging evidence already introduced against him.

8  Thus, he has failed to establish prejudice as required.  For all of these reasons, petitioner is not

9  entitled to relief on this claim.

10              3.  Failure to Investigate and Use Expert Witnesses

11    Petitioner claims that his trial counsel rendered ineffective assistance because of

12  his failure to investigate and use expert witnesses.  Petitioner explains that while proceeding in

13  pro per, he obtained identification and accident reconstruction experts funded through the

14  Indigent Defense Program and that those two experts were "prepared for trial."  (Pet. at

15  consecutive p. 15.)  Petitioner does not explain the substance of any testimony these experts

16  would have given.  Rather, he merely states:

17              Due to the circumstantial evidence and failure of any witnesses to
             identify petitioner, the experts were needed to educate the jury on
18           memory and identifications.  Also counsel failed to use accident
             reconstruction expert Kirk Berry to testify to speeds and road
19           configurations, also his testimony of the scene of arrest that would
             have been used to impeach Officer Gooler and Deputy Anderson.
20           It would have shown the jury that Deputy Anderson's testimony
             was manufactured.
21

22  (Id.)  Petitioner also argues that because the evidence against him was "circumstantial," he was

23  not identified at the live lineup, and the in-court identification was "suggestive," an identification

24  expert was needed to "educate the jury on memory and identification and its suggestiveness."

25  (Traverse, Ex. E at 1.)  Finally, petitioner suggests that even the trial judge expressed a belief in

26  the need for testimony from a defense identification expert.  (Id. at 3.)

At the hearing on petitioner's motion to preclude his in-court identification by the victims, petitioner's counsel argued against the court's position that the credibility of the in-court identification could adequately be explored through cross-examination.  Specifically, counsel contended that forcing him to cross-examine the victims about their identification of petitioner would "put the burden on me then to bring an expert in on eyewitness identification to talk about the inherent suggestibility of in-court identifications."  (RT at 229-30.)  In response to this argument, the trial court merely stated:

> And if you have an expert witness to put on the stand, that will all depend upon what the witnesses say as far as identifying him in court.
>
> If they come in and readily identify him and stick to that, despite what obviously you're going to use to impeach them, depending on how you assess their credibility on that issue, you can decide you need to have expert testimony on the issue . . ."

(Id. at 231.)  Contrary to petitioner's suggestion in the traverse, this exchange does not reflect the trial judge expressing "to petitioner's trial attorney Mr. Staats that he may need to use an expert witness." (Traverse, Ex. E at 3.)   Rather, the court was merely responding to counsel's argument by indicating that the decision whether to call an identification expert as a defense witness was one the defense would have to make based upon a number of factors, including whether the defense believed the victims' identification testimony was credible or had been adequately impeached by the victims' prior inconsistent identification and descriptions of the perpetrators.

Petitioner raised this claim for the first time in a petition for writ of habeas corpus filed in the Sacramento County Superior Court.  (Answer, Ex. O.)  The Superior Court rejected petitioner's arguments on the merits and on the ground that the petition was untimely filed. (Answer, Ex. P at 2.)  On August 28, 2000, petitioner raised the same claim in a petition for writ of habeas corpus filed in the California Court of Appeal.  (Answer, Ex. K.)  That petition was denied with a citation to In re Hillery, 202 Cal. App.2d 293 (1962).  (Answer, Ex. L.)  On July 24, 2002, petitioner raised the claim in another petition for writ of habeas corpus filed in the

California Court of Appeal.  (Answer, Ex. Q.)  That petition was summarily denied by order

dated August 1, 2002.  (Answer, Ex. R.)  On September 13, 2000, petitioner raised the same

claim in a petition for writ of habeas corpus filed in the California Supreme Court.  (Answer, Ex.

M.)  That petition was denied by order dated May 23, 2001, with citations to In re Dixon, 41 Cal.

2d 756 (1953), In re Waltreus, 62 Cal. 2d 218 (1965), In re Lindley, 29 Cal. 2d 709 (1947), and

In re Swain, 34 Cal. 2d 304 (1949).  (Answer, Ex. N.)  On December 30, 2002, petitioner raised

the claim in another petition for writ of habeas corpus filed in the California Supreme Court.

(Answer, Ex. S.)  That petition was denied with citations to In re Clark, 5 Cal. 4th 750 (1993), In

re Miller, 17 Cal. 2d 734 (1941), In re Dixon, In re Waltreus, and In re Lindley, by order dated

July 30, 2003.  (Answer, Ex. T.)  Under these circumstances, it is unclear whether the California

Supreme Court denied this claim on the merits or on purely procedural grounds.  However,

petitioner is not entitled to relief on this claim even if it is subject to de novo review.

   The California Superior Court denied petitioner's claim of ineffective assistance

of counsel, reasoning as follows:

> Petitioner claims that trial counsel was ineffective for failing to
> investigate and use expert witnesses on Petitioner's behalf,
> specifically experts on eyewitness identification and accident
> reconstruction.  Although he claims that the accident
> reconstruction expert would have impeached the officers'
> testimony about the way that the crash occurred, he provides no
> evidence of the proposed testimony.  Furthermore, there is no
> indication that impeachment on the way the accident occurred
> would have substantially affected the trial or the sentence, which
> was based primarily on the two residential robberies and prior
> conviction enhancements.  Therefore, Petitioner has failed to show
> that counsel was deficient for failing to use the accident
> reconstruction expert or that the failure was prejudicial.  There is
> similarly no evidence of what an identification expert would have
> testified to, if called. . . . Even if trial counsel should have called
> the identification expert, Petitioner has not shown that it is
> reasonably probable that the result would have been different.

(Answer, Ex. P at 2-3.)

   This court agrees with the California Superior Court that petitioner has failed to

demonstrate prejudice with respect to this claim.  Even assuming arguendo that petitioner's trial

1    counsel failed to properly investigate the possibility of calling the two expert witnesses to testify

2    and that this failure was outside "the wide range of professionally competent assistance" that the

3    Sixth Amendment requires, petitioner has not shown how the calling of these potential witnesses

4    would have led to a different outcome.  Although petitioner broadly asserts that the accident

5    reconstruction expert "would have impeached Deputy Scott Anderson that it would have been

6    impossible for him to see what he testified to in rebuttal," (traverse at 6), petitioner does not

7    provide any specifics about this proposed testimony.  Nor does he explain how an identification

8    expert would have affected the outcome of his trial.  See Jackson v. Calderon, 211 F.3d 1148,

9    1159-60 (9th Cir. 2000), cert. denied 531 U.S. 1072 (2001); Villafuerte v. Stewart, 111 F.3d 616,

10   632 (9th Cir. 1997) (petitioner's ineffective assistance claim denied where he presented no

11   evidence concerning what counsel would have found had he investigated further, or what

12   lengthier preparation would have accomplished); United States v. Harden, 846 F.2d 1229, 1231-

13   32 (9th Cir. 1988) (no ineffective assistance because of counsel's failure to call a witness where,

14   among other things, there was no evidence in the record that the witness would testify); United

15   States v. Berry, 814 F.2d 1406, 1409 (9th Cir. 1987) (appellant failed to meet prejudice prong of

16   ineffectiveness claim because he offered no indication of what potential witnesses would have

17   testified to or how their testimony might have changed the outcome of the hearing).

18           Further, as noted above, "'ineffective assistance claims based on a duty to

19   investigate must be considered in light of the strength of the government's case.'"  Bragg, 242

20   F.3d at 1088 (quoting Eggleston, 798 F.2d at 376).  Here, the case against petitioner was

21   overwhelming.  He was observed virtually from the moment he walked toward the victims'

22   residence at 2:40 a.m. and then ran out of the home carrying items until his car was forcibly

23   stopped by the police.  His vehicle was found to contain the proceeds of the robbery.  Under

24   these circumstances, petitioner cannot demonstrate a reasonable probability that, but for

25   counsel's failure to investigate and present expert witnesses on accident reconstruction and

26   /////

40

eyewitness identifications, the result of the trial would have been different.  Accordingly, for all of these reasons, petitioner is not entitled to relief on this claim.

### C. Petitioner's Right of Self-Representation

Petitioner claims that the state coerced him into abandoning his right of self-representation by providing him with inadequate legal materials and refusing to allow him sufficient time to meet with his proposed expert witnesses.  (Pet., consecutive p. 6.)  Petitioner raised this claim on appeal in state court.  The California Court of Appeal fairly described the background facts as follows:

> Defendant was arraigned on March 17, 1997, and the public defender was appointed to represent him.  The preliminary hearing was conducted on May 22, 1997.  Defendant was thereafter arraigned on an amended information on June 4, 1997, and the public defender was reappointed.

> On October 14, 1997, defendant's Marsden motion was heard and denied.

> On November 24, 1997, defendant exercised his right to represent himself under Faretta and the public defender was relieved.  The trial date at that time was December 12, 1997.

> On December 2, 1997, defendant orally requested a continuance of the trial date.  The trial court advised him file a written motion.  When defendant replied that he was not getting access to the jail's law library, the court told him to file the motion as soon as he got access.

> On December 4, 1997, defendant filed written motions for continuance, for pretrial discovery, for production of all physical evidence, and for independent defense testing of evidence.  On December 8, 1997, the trial date was vacated and reset for March 10, 1998.

> Between December 15, 1997, and March 10, 1998, defendant filed many additional motions, and the trial court held more than one hearing on them.

> On March 5, 1998, the trial court considered inter alia another motion by defendant for a continuance of the trial date, which the court had not received.  Defendant stated: (1) the jail's law librarian had been ill for two weeks; (2) defendant needed the services of an accident reconstruction expert and an "ID expert"; (3) he also needed more time for trial preparation.  The prosecutor

objected to any further continuance, stating that defendant had said when he went pro per in November 1997 that he would be ready for trial once he had all discovery and he had it now; both defendants (Benoit also being pro per at that time) were just bringing motions for the sake of delay. The trial court stated it had seen no motion from defendant regarding "accident reconstruction"; defendant insisted he had filed such a motion. The trial court denied defendant's motion for continuance. However, on March 10, 1998, trial was trailed until April 1, 1998.

On March 27, 1998, defendant filed a "Motion to Order Assistance of Counsel, and Phone Access." Defendant argued therein that he was deprived on the means to prepare a defense because (1) he was given only two hours a week to use the jail law library, its books were obsolete, the law librarian was still absent due to illness and his replacement lacked the legal training to assist prisoners; (2) the absent law librarian was also the court's assigned runner to deliver pro per motions to the court and no alternative means of doing this had been provided; (3) defendant had not been allowed to communicate with his experts and potential witnesses on confidential phone lines. He asked the appointment of a paralegal to assist him.

The court heard defendant's motion on April 1, 1998. The court first noted that it had contacted the law librarian/"Pro Per officer's" replacement, who reported that he and defendant had been in regular contact and were well acquainted with each other; accordingly, the court found that the law librarian's absence had not materially harmed defendant. Defendant then said: "I would also just like to get counsel back then because I can't function . . . ." The court asked who had been defendant's lawyer before he began to represent himself. Defendant replied that he had been represented by Peter Vlautin of the Public Defender's Office, but had gone pro per because of a conflict with that office. The court stated it would construe defendant's motion as a motion for the appointment of counsel and put over the motion until the next day so that Vlautin could appear. Defendant did not object to the court's decision to so construe the motion, nor did he insist that the court reach and decide the merits of his remaining allegations.[13]

On April 2, 1998, the trial court continued the motion to April 13, 1998. On that date the court granted the motion and appointed new counsel, but did not revoke defendant's pro per status. Finally, on

/////

/////

_____

[13] Defendant agreed that his request for phone access was moot if the trial court appointed new counsel.

1         April 15, 1998, the court revoked defendant's <u>pro per</u> status and
2   granted counsel's motion to continue the trial date to June 16, 1998.

3   (Opinion at 23-26.)

4         The state appellate court rejected petitioner's argument that he was coerced into

5   abandoning his right to self-representation, stating:

6         we summarily reject defendant's assertion that the alleged
    restrictions on his <u>pro per</u> privileges and the denial of some of his
7   pretrial motions amounted to coercing him into abandoning self-
    representation.  There is simply no evidence to support this claim.
8

9   (<u>Id.</u> at 28.)

10        In <u>Faretta v. California</u>, 422 U.S. 806, 821 (1975), the United States Supreme

11  Court held that a defendant in a state criminal trial has a right to self-representation inferred from

12  the Sixth Amendment.  However, that right "may be waived through defendant's subsequent

13  conduct indicating he is vacillating on the issue or has abandoned his request altogether."  <u>Brown</u>

14  <u>v. Wainwright</u>, 665 F.2d 607, 611 (5th Cir. 1982).  <u>See also</u> <u>Sandoval v. Calderon</u>, 241 F.3d 765,

15  774 (9th Cir. 2000).  Petitioner does not claim that the trial court improperly terminated his right

16  to represent himself, nor does he dispute that he asked the trial court to reappoint counsel.

17  Rather, petitioner is arguing that he was compelled to request counsel because of difficulties

18  experienced in gaining access to legal assistance and library time as well as restrictions placed on

19  visits from his proposed experts at the jail where he was detained.[14]  In his claim before this

20  court, petitioner also contends that the overall "circumstances," including his inability to meet

21  with his two proposed expert witnesses, forced him to "abandon his defense" and violated his

22  "right to self-representation."  (Pet. at consecutive p. 6.)

23  /////

24

25      [14]  Petitioner complains that the jail only allowed him to meet with the accident
    reconstruction expert one time and that it "would not allow the identification expert to get
26  cleared to visit on various occasions."  (Pet. at consecutive p. 6.)

1    Petitioner has failed to demonstrate that the circumstances surrounding his request

2    for the reappointment of counsel violated any of his federal constitutional rights, including the

3    right to represent himself.  Petitioner's <u>Faretta</u> motion was granted and he continued in pro per

4    until he chose to obtain the assistance of counsel.  It is true that petitioner appeared to be

5    overwhelmed by the amount of work to be done in order to prepare for trial on his own behalf

6    and experienced frustration at the realities of carrying out that work in a jail setting.  However,

7    there is no evidence that anyone coerced him to abandon his right to represent himself or that he

8    was unable to proceed on his own behalf if he wished to do so.  For instance, although petitioner

9    may have found it difficult to arrange visits with his expert witnesses, the record reflects that he

10   was able to retain witnesses and that they performed work on his behalf.  (Traverse, Ex. C to Ex.

11   E.)  With regard to petitioner's complaints about the inability to meet with his experts, the

12   California Court of Appeal made the following point:

13           What defendant overlooks, however, is that most of his allegations
             never reached the point of factual findings by the trial court.  After
14           the court found against him on the first point he raised, he
             immediately asked that be (sic) allowed to cease representing
15           himself and be appointed new counsel.  The court granted this
             request by deeming his motion to be a motion for appointment of
16           counsel.  Thus the prosecution never had the opportunity to put on
             evidence in reply to defendant's allegations and the court never had
17           the opportunity to find that the allegations were either proven or
             unproven.  Defendant in effect asks us to take his bare allegations
18           as true and jump to the legal questions he wishes us to decide.  We
             may not do so.
19

20   (Opinion at 26.)  This court agrees with the assessment of the Court of Appeal.  Petitioner's

21   claim that he was "coerced" to abandon his right to represent himself lacks a factual basis and

22   must be rejected.

23           The court also notes that there is no evidence that restrictions imposed by jail

24   officials on visits from expert witnesses, or the difficulties experienced by petitioner gaining

25   access to the law library or the librarian, prevented petitioner from accessing the court.  <u>See</u>

26   <u>Bounds v. Smith</u>, 430 U.S. 817, 821 (1977) ("It is now established beyond doubt that prisoners

1   have a constitutional right of access to the courts").  On the contrary, the record reflects that

2   petitioner was able to have his many concerns addressed through the trial court by filed or oral

3   motions.  Petitioner has not pointed to any request that he was prevented from presenting to the

4   trial court as a result of the limitations about which he complains.  Further, there is no evidence

5   in the record that the jail officials arbitrarily withheld from petitioner privileges granted by state

6   law or otherwise curtailed his right to self-representation, in violation of his due process rights.

7   See Montanye v. Haymes, 427 U.S. 236 (1976) (a substantial state-created right, even though not

8   constitutionally compelled, may not be arbitrarily withheld).  Indeed, the trial court contacted the

9   law librarian and, after a discussion, determined that petitioner's access to the law library had not

10  been "materially harmed" by the absence of the regular librarian.  (Opinion at 25.)

11          This court concludes that the circumstances presented here did not have a coercive

12  impact on petitioner's decision to relinquish the right to represent himself at trial.  The decision

13  of the California Court of Appeals to the same effect is not contrary to or an unreasonable

14  application of federal law.  See Kane v. Espitia, ___U.S.___, 126 S. Ct. 407, 408 (2005) ("[A]s it

15  is clear that Faretta says nothing about any specific legal aid that the State owes a pro se criminal

16  defendant . . . the court below therefore erred in holding, based on Faretta, that a violation of a

17  law library access right is a basis for federal habeas relief.")  Accordingly, petitioner is not

18  entitled to relief on this claim.

19          D.  Prosecutorial Misconduct

20          Petitioner raises several claims of prosecutorial misconduct.  After setting forth

21  the applicable legal principles, the court will evaluate these claims in turn below.

22          1.  Legal Standards

23          A defendant's due process rights are violated when a prosecutor's misconduct

24  renders a trial fundamentally unfair.  Darden v. Wainwright, 477 U.S. 168, 181 (1986).

25  However, such misconduct does not, per se, violate a petitioner's constitutional rights.  Jeffries v.

26  Blodgett, 5 F.3d 1180, 1191 (9th Cir. 1993) (citing Darden, 477 U.S. at 181, and Campbell v.

45

Kincheloe, 829 F.2d 1453, 1457 (9th Cir. 1987)).  Claims of prosecutorial misconduct are

reviewed "'on the merits, examining the entire proceedings to determine whether the prosecutor's

[actions] so infected the trial with unfairness as to make the resulting conviction a denial of due

process.'"  Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995) (citation omitted).  See also

Greer v. Miller, 483 U.S. 756, 765 (1987); Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974);

Turner v Calderon, 281 F.3d 851, 868 (9th Cir. 2002).  Relief on such claims is limited to cases

in which the petitioner can establish that prosecutorial misconduct resulted in actual prejudice.

Johnson, 63 F.3d at 930 (citing Brecht, 507 U.S. at 637-38); see also Darden, 477 U.S. at 181-83;

Turner, 281 F.3d at 868.  Put another way, prosecutorial misconduct violates due process when it

has a substantial and injurious effect or influence in determining the jury's verdict.  See Ortiz-

Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996).

2. Failing to Timely Disclose Court Ordered Discovery

Petitioner claims that the prosecutor deliberately withheld court ordered discovery

in the form of the above-described photograph of a ski mask found in petitioner's car.  Petitioner

contends, as he did in several of his claims addressed above, that information suggesting the

robbers were masked would have undermined the victims' identification of him as the

perpetrator.  (Pet. at consecutive p. 7.)  Petitioner argues, "the victims manufactured suggestive

identifications were just that manufactured, the ski masks shows there could have never been any

identifications of the suspects."  (Id.)  See also Traverse, Ex. D at p. 9 ("had the jury learned that

the suspects were 'masked' the two key witnesses against petitioner would have been impeached

about their identifications and it's a reasonable probability petitioner could have obtained a

different result").

In Brady v. Maryland, the United States Supreme Court held "that the suppression

by the prosecution of evidence favorable to an accused upon request violates due process where

the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith

of the prosecution."  373 U.S. at 87.  See also Bailey v. Rae, 339 F.3d 1107, 1113 (9th Cir.

2003).  The duty to disclose such evidence is applicable even though there has been no request by the accused, United States v. Agurs, 427 U.S. 97, 107 (1976), and encompasses impeachment evidence as well as exculpatory evidence.  United States v. Bagley, 473 U.S. 667, 676 (1985).  A Brady violation may also occur when the government fails to turn over evidence that is "known only to police investigators and not to the prosecutor."  Youngblood v. West Virginia, 126 S. Ct. 2188, 2190 (2006) (quoting Kyles, 514 U.S. at 437, 438) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police").  There are three components of a Brady violation:  "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  See also Banks v. Dretke, 540 U.S. 668, 691 (2004); Silva v. Brown, 416 F.3d 980, 985 (9th Cir. 2005).  In order to establish prejudice, a petitioner must demonstrate that "'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense."  Strickler, 527 U.S. at 289.  "The question is not whether petitioner would more likely than not have received a different verdict with the evidence, but whether "in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  (Id.) (quoting Kyles v. Whitley, 514 U.S. 419, 434  (1995)).  See also Silva, 416 F.3d at 986 ("a Brady violation is established where there 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'")  Once the materiality of the suppressed evidence is established, no further harmless error analysis is required.  Kyles, 514 U.S. at 435-36; Silva, 416 F.3d at 986.  "When the government has suppressed material evidence favorable to the defendant, the conviction must be set aside."  Silva, 416 F.3d at 986.

Petitioner raised this claim for the first time in a petition for writ of habeas corpus filed in the Sacramento County Superior Court.  (Answer, Ex. O.)  The Superior Court rejected

1   petitioner's arguments on the merits and on the ground that the petition was untimely filed.

2   (Answer, Ex. P at 2.)  On August 28, 2000, petitioner raised the same claim in a petition for writ

3   of habeas corpus filed in the California Court of Appeal.  (Answer, Ex. K.)  That petition was

4   denied with a citation to In re Hillery, 202 Cal. App. 2d 293 (1962).  (Answer, Ex. L.)  On July

5   24, 2002, petitioner raised the same claim in another petition for writ of habeas corpus filed in

6   the California Court of Appeal.  (Answer, Ex. Q.)  That petition was summarily denied by order

7   dated August 1, 2002.  (Answer, Ex. R.)  On September 13, 2000, petitioner raised the claim in a

8   petition for writ of habeas corpus filed in the California Supreme Court.  (Answer, Ex. M.)  That

9   petition was denied by order dated May 23, 2001, with citations to In re Dixon, 41 Cal. 2d 756

10  (1953), In re Waltreus, 62 Cal. 2d 218 (1965), In re Lindley, 29 Cal. 2d 709 (1947), and In re

11  Swain, 34 Cal. 2d 304 (1949).  (Answer, Ex. N.)  On December 30, 2002, petitioner raised the

12  same claim in another petition for writ of habeas corpus filed in the California Supreme Court.

13  (Answer, Ex. S.)  That petition was denied with citations to In re Clark, 5 Cal. 4th 750 (1993), In

14  re Miller, 17 Cal. 2d 734 (1941), In re Dixon, In re Waltreus, and In re Lindley, by order dated

15  July 30, 2003.  (Answer, Ex. T.)  Under these circumstances, it is unclear whether the California

16  Supreme Court denied this claim on the merits or on purely procedural grounds.  However, the

17  claim must be rejected even if a de novo standard of review is employed.

18          The facts surrounding the photograph of a ski mask have been set forth above in

19  connection with petitioner's claim of trial court error.  In a nutshell, although one of the police

20  reports stated that a ski mask had been found in petitioner's vehicle and reported that

21  photographs were taken of all items found in the vehicle, the prosecutor was unable to locate a

22  photograph of a ski mask to turn over in discovery.  According to the report of evidence obtained

23  from the scene, a ski mask was recovered from petitioner's car.  Even assuming, however, that

24  the prosecutor deliberately withheld production of a photograph of a ski mask, there is no

25  evidence in the record suggesting that the photograph was exculpatory or that disclosure of such

26  a photograph could reasonably have put the case against petitioner in such a different light so as

48

to undermine confidence in the verdict.  See Kyles, 514 U.S. at 435; Silva, 416 F.3d at 986.  As discussed above, evidence that a mask was found in petitioner's vehicle would not have undermined the witness identifications because the victims specifically recalled seeing the perpetrators' faces.  Mr. Pimentel testified that petitioner was wearing a knitted hat during the robbery (RT 380-81) and the prosecutor took the position that the ski mask referred to in discovery was actually a knit cap with hand cut eye holes (RT at 175).  Thus, petitioner has failed to demonstrate that the photograph of the ski mask had any exculpatory value.  Indeed, petitioner originally sought to exclude evidence of the mask found in his car.  Further, as discussed above, petitioner's convictions on the charges against him were supported by overwhelming evidence, even without the victims' identification of him.

Finally, the court notes that petitioner was aware from the police report that a mask had been found in his vehicle, and he also knew about the news report which mentioned that the perpetrators had worn masks.  Petitioner could have made whatever use of this information he desired.  See United States v. Alvarez, 86 F.3d 901, 905 (9th Cir. 1996) (no prejudice to defendant from government's untimely production of officer's rough notes reflecting discrepancies with his testimony where the defense eventually received the rough notes and was able to make use of them to fully cross-examine the officer about the discrepancies in his report); Cf. Silva, 416 F.3d at 990-91 (prosecutor's failure to disclose at any time during trial evidence of an agreement with a star government witness where such evidence could have seriously undermined mental competence of witness found to constitute a due process violation entitling petitioner to habeas relief).

Petitioner has not shown that production in discovery of a photograph of the mask found in his vehicle would have affected the result of his trial in any way.  Accordingly, the state courts did not commit federal constitutional error in rejecting petitioner's argument that his convictions were tainted by the Brady violation.

/////

3.  <u>Suppressing Exculpatory Evidence Regarding a 911 Tape and Police Dispatch</u>

Petitioner claims that the prosecutor suppressed exculpatory evidence contained on the consolidated audio tape of the 911 call placed by the victims' daughter and the police dispatch communication.  Petitioner contends that the tape recording produced to the defense was "missing" three minutes and twenty nine seconds and that the missing portion of the tape contained identifying information about the suspect vehicle that did not match petitioner's vehicle.  (Pet. at consecutive p. 13-14.)  Specifically, petitioner states that when he bought his vehicle it did not have a front license place.  (<u>Id.</u> at 13.)  Officer Gooler testified at trial that he viewed the license plate of petitioner's vehicle at some point and broadcasted it over his police radio during the pursuit.  (RT at 557.)  Petitioner asserts that "the license plate of defendant's vehicle had been deleted and the make and model of the car had also been deleted" from the audio tape of the police dispatch communication.  (Pet. at consecutive p. 13.)  Petitioner does not explain how he determined what was deleted from the tape, but he states that "the volume was turned up and down to delete certain areas that contained exculpatory and material evidence." (<u>Id.</u>)

Petitioner's claim that the prosecutor deliberately tampered with the audiotape of the victims' 911 call and dispatch recording to delete exculpatory evidence is conclusory and unsupported by any evidence in the record and must be rejected on that basis.  <u>See</u> <u>Jones</u>, 66 F.3d at 204; <u>James</u>, 24 F.3d at 26 (vague and conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief).  Petitioner has failed to demonstrate that there was anything missing from the audio recording produced to him in discovery.  He has also failed to establish that if any portion of the tape was inaudible that there was anything favorable to his defense in that portion of the transmission.  Finally, petitioner has demonstrated neither that any inaudible portion of the recording reflects suppression of evidence by the prosecution or that he suffered any prejudice as a result.  His unsupported allegations of prosecutorial

/////

1  misconduct are insufficient to support this claim.  Accordingly, petitioner is not entitled to

2  habeas relief.[15]

3       4.  Employing Unfair Surprise by Calling Deputy Anderson as a Rebuttal Witness

4          and Presenting False Testimony

5       Petitioner claims that the prosecutor committed misconduct when he called

6  Deputy Anderson to testify on rebuttal instead of during the prosecutions's case-in-chief and

7  elicited testimony from Anderson that was "false and perjured."  (Pet. at consecutive p. 8.)  In

8  support of this claim, petitioner notes that Deputy Anderson testified he did not write a report of

9  his observations, but reported orally to Deputy Gooler.  (Id.)

10      Petitioner raised this claim for the first time in a petition for writ of habeas corpus

11  filed in the Sacramento County Superior Court.  (Answer, Ex. O.)  The Superior Court rejected

12  petitioner's arguments on the merits and on the ground that the petition was untimely filed.

13  (Answer, Ex. P at 2.)  On August 28, 2000, petitioner raised the same claim in a petition for writ

14  of habeas corpus filed in the California Court of Appeal.  (Answer, Ex. K.)  That petition was

15  denied with a citation to In re Hillery, 202 Cal. App. 2d 293 (1962).  (Answer, Ex. L.)  On July

16  24, 2002, petitioner raised the claim in another petition for writ of habeas corpus filed in the

17  California Court of Appeal.  (Answer, Ex. Q.)  That petition was summarily denied by order

18  ───────────

19      [15]  Petitioner requests an evidentiary hearing on this claim.  Pursuant to 28 U.S.C. §
    2254(e)(2), a district court presented with a request for an evidentiary hearing must first

20  determine whether a factual basis exists in the record to support a petitioner's claims and, if not,
    whether an evidentiary hearing "might be appropriate."  Baja v. Ducharme, 187 F.3d 1075, 1078

21  (9th Cir. 1999).  See also Insyxiengmay v. Morgan, 403 F.3d 657, 669-70 (9th Cir. 2005).  He
    must also "allege[] facts that, if proved, would entitle him to relief."  Schell v. Witek, 218 F.3d

22  1017, 1028 (9th Cir. 2000).  Petitioner has not demonstrated that any additional facts need to be
    determined in order to resolve his claim of prosecutorial misconduct on the merits.  Even if his

23  bare and conclusory allegations were sufficient and assuming arguendo that the prosecutor
    withheld evidence that the tape recording reflected differences between the police description of

24  the suspect vehicle and petitioner's vehicle, petitioner has failed to demonstrate prejudice.
    Again, police officers observed petitioner's car from the time of the robbery until they forced it to

25  stop.  Under these circumstances, any discrepancies in the description of the vehicle by officers
    in pursuit reflected on the police audio tape would not be sufficient to undermine confidence in

26  the outcome of petitioner's trial.  Accordingly, an evidentiary hearing is not warranted on this
    claim.

dated August 1, 2002.  (Answer, Ex. R.)  On September 13, 2000, petitioner raised the same

claim in a petition for writ of habeas corpus filed in the California Supreme Court.  (Answer, Ex.

M.)  That petition was denied by order dated May 23, 2001, with citations to In re Dixon, 41 Cal.

2d 756 (1953), In re Waltreus, 62 Cal. 2d 218 (1965), In re Lindley, 29 Cal. 2d 709 (1947), and

In re Swain, 34 Cal. 2d 304 (1949).  (Answer, Ex. N.)  On December 30, 2002, petitioner raised

the claim in another petition for writ of habeas corpus filed in the California Supreme Court.

(Answer, Ex. S.)  That petition was denied with citations to In re Clark, 5 Cal. 4th 750 (1993), In

re Miller, 17 Cal. 2d 734 (1941), In re Dixon, In re Waltreus, and In re Lindley, by order dated

July 30, 2003.  (Answer, Ex. T.)  Under these circumstances, it is unclear whether the California

Supreme Court denied this claim on the merits or on purely procedural grounds.  However, even

employing a de novo standard of review, petitioner is not entitled to relief on this aspect of his

prosecutorial misconduct claim.

        The background to this claim was described by the California Court of Appeal and

has been set forth above on pgs. 10-12.  In addition, Deputy Anderson testified on rebuttal as

follows:

        Q.  Now, Deputy, did you write a report about – on this case?

        A.  No, I did not.

        Q.  Any why is that, sir?

        A.  My involvement in the entire situation was so limited.  I was
        following the primary pursuit officer.  I wasn't the primary – the
        officer involved in the pursuit, and I wasn't the one that actually
        apprehended the passenger.

        So the other officers told me at the scene that they would take care
        of all the details, and they would just include me into their portion
        of the report, what I did.

                                * * *

        Q.  Do they or do they not teach you at the academy to write a
        report when you're involved in a criminal investigation or an arrest
        in some fashion?

/////

1    A.  Not all officers involved need to write one in all cases.

2    Q.  Was there an officer in charge of the crime scene, the crash
     site?  Was there an officer in charge that you were aware of?
3
4    A.  In most cases the primary officer in the pursuit takes
     responsibility.  I don't know if he did or not.

5    Q.  And who was that in this case?

6    A.  That would have been Todd Gooler.

7    Q.  And did Todd Gooler ever tell you not to write a report?

8    A.  I don't recall who had told me that.  I know there was several
     officers there and a couple sergeants on scene.  And I remember
9    being told by a couple people that my portion of the pursuit would
     be covered in their reports.

10                                  * * *

11
     Q.  You indicated, Deputy, that you didn't write a report.  Did you
12   give an oral report to Deputy Gooler?

13   A.  Yes.

14   (RT at 914-15, 922-23, 931.)

15            Deputy Anderson also testified at trial that, although he considered his

16   observations "important information for a criminal investigation," he did not take notes or dictate

17   anything into a tape recorder.  (Id. at 916, 918-19.)  Petitioner's counsel re-called Officer Gooler

18   in order to impeach the rebuttal testimony of Deputy Anderson.  Defense counsel's reason for

19   wanting to re-call Officer Gooler was summarized by the trial court as follows:

20            there's no account in any other officers' report detailing what
              Officer Anderson testified to.  And Officer Anderson claims in his
21            testimony he was told the other officers put it in their reports.

22            It lends itself to the argument that the other officers didn't put it in
              their reports.  Either Officer Anderson didn't tell them, or it just
23            didn't happen, or whatever anybody wants to argue about all of
              that.
24

25   (Id. at 937.)  When he was recalled, Officer Gooler testified that "the only time that I would write

26   a report for another officer is if I actually observed whatever action that officer took."  (Id. at

                                        53

948.)  Gooler also testified that he did not tell Deputy Anderson that "he didn't need to write a report regarding what he had observed or what he participated in, that it would be included in a report prepared by you or other officers on the scene."  (Id. at 949.)  He stated, however, that he and Deputy Anderson discussed what had happened at the scene.  (Id. at 950-51.)

Petitioner argues that the foregoing testimony indicates that Deputy Anderson's testimony was false and he argues that the prosecutor had a duty to correct it.  (Traverse, Ex. F at 8-9.)  As discussed previously, the use of Deputy Anderson's testimony on rebuttal was reasonable and proper in this case.  The defense case presented through petitioner's own testimony introduced for the first time the possibility that there were more than two persons in petitioner's vehicle.  That new evidence compelled the prosecutor to put on evidence rebutting petitioner's testimony.  The court also notes that the prosecutor sought to call Deputy Anderson as a witness in his case-in-chief, but the trial court refused to grant a continuance in order to allow him to do so.  There is no evidence the prosecutor manipulated the timing of Deputy Anderson's testimony in order to inflict an unfair surprise on the defense.  Further, the prosecutor informed all parties of the substance of Deputy Anderson's proposed testimony prior to resting his case.  Therefore, that testimony could not have come as a "surprise" to petitioner or his counsel.  In short, petitioner has not demonstrated that the presentation of Deputy Anderson's testimony on rebuttal "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Johnson, 63 F.3d at 929.

Petitioner has also failed to demonstrate that the prosecutor presented knowingly false testimony.  "It is an established tenet of the due process clause that 'the deliberate deception of the court by the presentation of false evidence is incompatible with the rudimentary demands of justice.'"  United States v. Rewald, 889 F.2d 836, 860 (9th Cir. 1989) (quoting United States v. Endicott, 869 F.2d 452, 455 (9th Cir. 1989)).  "[A] conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict."  United States v. Bagley, 473 U.S. 667, 680 n.9 (1985).

1    See also Morales v. Woodford, 388 F.3d 1159, 1179 (9th Cir. 2004) ("The due process

2    requirement voids a conviction where the false evidence is 'known to be such by representatives

3    of the State.'") (quoting Napue v. Illinois, 360 U.S. 264, 269 (1959)).  This rule applies even

4    where the false testimony goes only to the credibility of the witness.  Napue, 360 U.S. at 269;

5    Mancuso v Olivarez, 292 F. 3d 939, 957 (9th Cir. 2002).  There are two components to

6    establishing a claim for relief based on the introduction of perjured testimony at trial.  First, the

7    moving party must establish that the testimony was false.  United States v. Polizzi, 801 F.2d

8    1543, 1549-50 (9th Cir. 1986).  Second, the movant must demonstrate that the prosecution

9    knowingly used the perjured testimony.  Id.  Mere speculation regarding these factors is

10   insufficient to meet movant's burden.   United States v. Aichele, 941 F.2d 761, 766 (9th Cir.

11   1991).

12          In the context of a petition for relief under 28 U.S.C. § 2255 the Ninth Circuit

13   Court of Appeals has held that proof of knowledge by the prosecution is required to support a

14   claim of denial of due process based upon the admission of prejudicial perjured testimony in a

15   criminal trial.  See Morales, 336 F.3d at 1151 ("The essence of the due process violation is

16   misconduct by the government, not merely perjury by a witness."); Marcella v. United States,

17   344 F.2d 876, 880 (9th Cir. 1965) ("Before a sentence may be vacated on the ground of perjured

18   testimony, the movant must show that the testimony was perjured and that the prosecuting

19   officials knew at the time such testimony was used that it was perjured."); Taylor v. United

20   States, 221 F.2d 228 (9th Cir. 1955).  See also Ortiz v. Stewart, 149 F.3d 923, 936 (9th Cir.

21   1998) ("If a prosecutor knowingly uses perjured testimony or knowingly fails to disclose that

22   testimony is false, the conviction must be set aside if there is any reasonable likelihood that the

23   false testimony could have affected the jury verdict.").

24          Petitioner has failed to demonstrate either that Deputy Anderson's testimony was

25   false or that the prosecutor knowingly used perjured testimony.  The mere fact that the substance

26   of Deputy Anderson's testimony was not set out in a written report does not mean that it was

1  false.  Petitioner's speculation that such is the case is insufficient to support a claim of

2  prosecutorial misconduct.[16]  Accordingly, petitioner is not entitled to relief on this claim.

3       5.  Informing a Witness of Petitioner's Criminal History and Improperly

4         Influencing Witness Testimony

5       Petitioner claims that the prosecutor improperly informed witness Dana Sutton

6  that petitioner was a "3-strike candidate," causing Sutton to tailor his testimony to favor the

7  prosecution.  Petitioner also claims the prosecutor improperly coached the victims, resulting in an

8  in-court identification based on the prosecutor's descriptions of petitioner and his co-defendant,

9  and not on the victims' recollections of the actual robbery.  As proof of this latter claim,

10  petitioner notes that the victims originally told police that the perpetrators were "Hispanic or

11  Mexican" and did not remember if they had any facial hair, but testified at the preliminary

12  hearing that the suspect was white and had facial hair.  (Pet. at consecutive p. 10-11.)

13       Petitioner raised this claim for the first time in a petition for writ of habeas corpus

14  filed in the Sacramento County Superior Court.  (Answer, Ex. O.)  The Superior Court rejected

15  petitioner's arguments on the merits and on the ground that the petition was untimely filed.

16  (Answer, Ex. P at 2.)  On August 28, 2000, petitioner raised the same claim in a petition for writ

17  of habeas corpus filed in the California Court of Appeal.  (Answer, Ex. K.)  That petition was

18  denied with a citation to In re Hillery, 202 Cal. App. 2d 293 (1962).  (Answer, Ex. L.)  On July

19  24, 2002, petitioner raised the claim in another petition for writ of habeas corpus filed in the

20  California Court of Appeal.  (Answer, Ex. Q.)  That petition was summarily denied by order

21  dated August 1, 2002.  (Answer, Ex. R.)  On September 13, 2000, petitioner raised the same

22  claim in a petition for writ of habeas corpus filed in the California Supreme Court.  (Answer, Ex.

23  M.)  That petition was denied by order dated May 23, 2001, with citations to In re Dixon, 41 Cal.

24

25  [16]  The testimony of Officer Gooler that he did not instruct Deputy Anderson not to write a report does not suggest that Deputy Anderson's testimony was false.  Anderson testified that he

26  didn't recall which officers told him that his portion of the pursuit would be covered in other reports and that he need not complete one.  (See RT at 922-23.)

2d 756 (1953), In re Waltreus, 62 Cal. 2d 218 (1965), In re Lindley, 29 Cal. 2d 709 (1947), and

In re Swain, 34 Cal. 2d 304 (1949).  (Answer, Ex. N.)  On December 30, 2002, petitioner raised

the claim in another petition for writ of habeas corpus filed in the California Supreme Court.

(Answer, Ex. S.)  That petition was denied with citations to In re Clark, 5 Cal. 4th 750 (1993), In

re Miller, 17 Cal. 2d 734 (1941), In re Dixon, In re Waltreus, and In re Lindley, by order dated

July 30, 2003.  (Answer, Ex. T.)  Under these circumstances, it is unclear whether the California

Supreme Court denied this claim on the merits or on purely procedural grounds.  However, the

claim should be denied even under a de novo standard of review.

        Petitioner's claim that the prosecutor improperly coached witnesses or allowed

them to give knowingly false testimony is conclusory and unsupported by any evidence in the

record.  The claim must be rejected on that basis alone.  See Jones, 66 F.3d at 204; James, 24

F.3d at 26.  Even assuming arguendo that the prosecutor told witness Dana Sutton that petitioner

was subject to California's Three Strike Law, there is no evidence that Sutton's testimony at trial

differed in any way from his original statements to police.  Although the victims' descriptions of

the perpetrators may have changed over time, any inconsistencies between the earlier and later

statements were fully explored at trial before the jury.  See United States v. Necoechea,

986 F.2d 1273 (9th Cir. 1993) (presentation of contradictory testimony not improper); United

States v. Tanh Huu Lam, 251 F.3d 852, 861 (9th Cir. 2001), amended 262 F.3d 1033 (9th Cir.

2001) (minor inconsistencies in witness testimony "harmless error"); United States v. Zuno-Arce,

44 F.3d 1420, 1423 (9th Cir. 1995) (no prosecutorial misconduct where petitioner offered no

evidence for prosecutorial misconduct except for the "inference from discrepancies" in witness

testimony).  In any event, witness credibility is a matter for the jury to decide.  Zuno-Arce, 44

F.3d at 1423.  Petitioner has failed to demonstrate that any testimony presented at his trial was

perjurious or that the government knowingly used false testimony to convict him.  Accordingly,

he is not entitled to relief on this claim.

/////

1    E.  Sufficiency of the Evidence

2          In the traverse, petitioner claims that the evidence was insufficient to support his

3    conviction.  (Traverse, Ex. B.)  This claim is not contained in the petition.  To the extent

4    petitioner is attempting to belatedly raise a new claim in this manner, it must be rejected.  See

5    Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) (a traverse is not the proper

6    pleading to raise additional grounds for relief); Greenwood v. Fed. Aviation Admin., 28 F.3d

7    971, 977 (9th Cir. 1994) ("we review only issues which are argued specifically and distinctly in a

8    party's opening brief").  Even if this claim had been properly raised, petitioner has failed to

9    demonstrate a constitutional violation.

10          The Due Process Clause of the Fourteenth Amendment "protects the accused

11   against conviction except upon proof beyond a reasonable doubt of every fact necessary to

12   constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  There

13   is sufficient evidence to support a conviction if, "after viewing the evidence in the light most

14   favorable to the prosecution, any rational trier of fact could have found the essential elements of

15   the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  See also

16   Prantil v. California, 843 F.2d 314, 316 (9th Cir. 1988) (per curiam).  "[T]he dispositive question

17   under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond

18   a reasonable doubt.'"  Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson,

19   443 U.S. at 318).  A petitioner for a federal writ of habeas corpus "faces a heavy burden when

20   challenging the sufficiency of the evidence used to obtain a state conviction on federal due

21   process grounds."  Juan H. v. Allen, 408 F.3d 1262, 1274, 1275 & n13 (9th Cir. 2005).  In order

22   to grant the writ, the federal habeas court must find that the decision of the state court reflected

23   an objectively unreasonable application of Jackson and Winship to the facts of the case.  Id.

24          The court must review the entire record when the sufficiency of the evidence is

25   challenged in habeas proceedings.  Adamson v. Ricketts, 758 F.2d 441, 448 n.11 (9th Cir. 1985),

26   vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987).  It is

the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319.  If the trier of fact could draw conflicting inferences from the evidence, the court in its review will assign the inference that favors conviction. McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994).  The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict.  United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991).  Thus, "[t]he question is not whether we are personally convinced beyond a reasonable doubt.  It is whether rational jurors could reach the conclusion that these jurors reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).  The federal habeas court determines sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law.  Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

After reviewing the record, this court concludes that there was sufficient evidence introduced at petitioner's trial to establish his guilt beyond a reasonable doubt as a principal or an aider and abettor of the home invasion robbery.  The fact that there may have been evidence that petitioner believes cast some degree of doubt on aspects of the prosecution's case is not dispositive of the issue.  Notwithstanding any such evidence, there was clearly substantial evidence from which a reasonable trier of fact could have found beyond a reasonable doubt that petitioner was guilty of the crimes charged against him.  Because there was substantial evidence presented at trial to support petitioner's conviction on these charges, the state court's analysis of this claim is not "objectively unreasonable." Woodford v. Visciotti, 537 U.S. 19, 25 (2002).  See also 28 U.S.C. § 2254(d)(1).  Accordingly, petitioner is not entitled to relief on his claim challenging the sufficiency of the evidence upon which he was convicted.

/////

/////

/////

/////

1                                          CONCLUSION

2              Accordingly, IT IS HEREBY ORDERED that petitioner's application for a writ of

3    habeas corpus is denied.

4    DATED: September 25, 2006.

5

6                                          _____

7                                          DALE A. DROZD
                                           UNITED STATES MAGISTRATE JUDGE
8    DAD:8
     morris1567.hc
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26